UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
At FRANKFORT

|  |  |  |
|---|---|---|
| OSCAR ADAMS and MICHAEL KNIGHTS, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Case No. 3:14-cv-001 (E.D.Ky) |
| v. | ) | |
| | ) | |
| THE COMMONWEALTH OF KENTUCKY, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| | ) | |

EXPERT REPORT OF DR. DENNIS COKELY

September 16, 2014

**Expert Qualifications**

I am currently a tenured, full Professor of American Sign Language ("ASL") and Modern Languages at Northeastern University, where I serve as the Director of the American Sign Language Program, Director of the World Languages Center and the Chair of the Department of Languages, Literatures and Cultures. I have been involved with Deaf people on a personal and professional level for over forty-six years. I hold a Master's Degree in Applied Linguistics from American University and a Doctorate in Sociolinguistics from Georgetown University. I am a nationally certified Sign Language interpreter and have served two terms as President of the Registry of Interpreters for the Deaf ("RID"), the professional organization of and the national certifying body for interpreters.

I have also published extensively in the areas of ASL interpretation and sociolinguistics, among other topics.  I have authored or coauthored 10 textbooks, 5 book chapters, 35 articles or conference proceedings, have directed and/or edited over 350 videotapes focusing on ASL and ASL/English Interpretation, and have also produced and published translations of over 80 videotapes. The 1980 series of five texts that I co-authored is still widely used in Sign Language programs and classes across the United States. My 1992 book, *A Sociolinguistic Model of the Interpretation Process*, is widely used in Interpreter Education Programs, has been translated into Italian and German, and significant portions have been translated into Swedish and Japanese. I am currently the Principal Investigator for a three million dollar grant from the U.S. Department of Education to establish a National Interpreter Education Center at Northeastern University.

Prior to joining Northeastern, I spent twelve years working full-time as the President and co-owner of Sign Media, Inc., a video-production company specializing in producing print and video material focused on the American Deaf Community, ASL, and ASL/English Interpretation. Prior to that, I spent thirteen years working at Gallaudet University[1] in a number of capacities, including as a teacher of elementary, undergraduate and graduate students; an administrator responsible for teaching and evaluating faculty and staff; and a Research Associate in the Linguistics Research Lab researching ASL/English interpretation.

---

[1] Gallaudet University is a federally chartered private university for the education of the Deaf and hard of hearing located in Washington, D.C.

I have been retained as an expert witness in several matters, including but not limited to *Minnis v. Virginia Department of Corrections*.   Attached as **Exhibit A** is my complete curriculum vitae, which includes a listing of all instances in which I have served as an expert witness.

 I have been retained by Weil, Gotshal & Manges LLP to work on this case at the rate of $150.00 per hour unless travel is required, in which case my rate is $250.00 per hour.  My rate is $300.00 per hour for time spent testifying in court or at a deposition.  I am also being reimbursed for all necessary and attendant out-of-pocket expenses incurred in connection with my work on this case.  Payment of my rates or reimbursement of expenses are not contingent or in any other way based upon the opinions or conclusions I offer or the outcome of this case.

I have been asked to opine on (1) whether d/Deaf and hard of hearing inmates in the Kentucky Department of Corrections (the "KDOC") have been denied effective communication and access to services and technology to make effective communication possible; (2) whether d/Deaf and hard of hearing inmates have been denied a access to services, programs and benefits that are afforded to non-deaf inmates; and (3) examples of steps that the KDOC should take to ensure effective communication.  In addition, I have been asked to provide background and sociolinguistic information concerning the American Deaf Community.

The opinions I have formed are introduced in the Executive Summary and explained in more detail below.  I have based my opinions in this case on my extensive knowledge and experience, textbooks, websites and literature, and my review of exhibit materials provided to me by counsel and certain additional materials.  **Exhibit B**, attached to this Report, lists in more detail the materials that I have considered and on which I have relied in forming the opinions stated herein.  I expect to be called to provide expert testimony at the trial regarding the opinions that I have formed.  This report sets forth my opinions at this time, and I reserve the right to amend or supplement this report to address additional information learned through further discovery, including depositions, requests for admission and documents.  I also reserve the right to address any issues raised by Defendants' experts.

**Executive Summary**

Members of the American Deaf Community are a linguistic and cultural minority. The language that binds them together and is the critical determinant for membership in the Community is ASL. The vast majority of people who are not deaf have naïve and stereotypic misconceptions about d/Deaf[2] people and ASL. For example, many people believe that d/Deaf people can lip-read with a degree of accuracy that will enable meaningful communication, when in reality the level of lip-reading accuracy for most d/Deaf people is 30% at best. In addition, many people believe that d/Deaf people can read and write in fluent English when, in reality, the average Deaf person reads at approximately a fourth grade reading level. Those who are not d/Deaf fail to understand that effective communication with d/Deaf people requires that one communicate visually – this means using visual signals and alarms and provision of sign language interpreters when needed. These erroneous, stereotypical beliefs about and attitudes toward d/Deaf people often result in systematic discrimination against d/Deaf people. Such discrimination, known as audism, occurs when (1) those who are not d/Deaf assume that d/Deaf people are inferior because of their different hearing status; and (2) when access to environments, technology, institutions and programs is predicated upon one's ability to hear. Simply put, the failure to provide visual access to aspects of society that are only auditorily accessible is audism.

Based on my experience of over forty years, and my review of the written documentation set forth in **Exhibit B**, I believe that d/Deaf and hard of hearing inmates detained by KDOC have been denied effective communication and access to the services and technology that can make effective communication possible. I further believe that KDOC has restricted access to services, programs and communication in a way that denies meaningful and effective communicative access for KDOC d/Deaf and hard of hearing inmates. In addition, I believe that the procedures that the KDOC utilizes unfairly and unnecessarily treat d/Deaf and hard of hearing KDOC inmates differently than non-deaf inmates and denies them access to services, programs and benefits that are afforded to non-deaf inmates. In sum, I believe that KDOC is guilty of audism and engages in audist behaviors. To ensure effective communication, as well as the physical safety of d/Deaf and hard of hearing inmates, KDOC must, *minimally*, undertake the following major steps.

---

[2] The significance of the distinction between lower case and upper case D in the word d/Deaf is explained below.

1. To enable d/Deaf and hard of hearing inmates to communicate effectively with others at KDOC facilities, KDOC must provide d/Deaf and hard of hearing inmates with qualified sign language interpreters. This need is most acute in all group settings and all "high stakes" one-on-one settings, such as medical appointments and visits, psychological evaluations, offender treatment and rehabilitation programs, disciplinary/investigative proceedings and other hearings, and educational courses and evaluations. For those situations in which a qualified sign language interpreter is needed on short notice or in an emergency situation, KDOC should provide d/Deaf and hard of hearing inmates access to Video Remote Interpreting ("VRI") that functions reliably and appropriately.

2. To enable d/Deaf and hard of hearing inmates to communicate effectively with others outside of KDOC facilities, KDOC must provide d/Deaf and hard of hearing inmates with access to a videophone ("VP") and, if functionally appropriate, a captioned telephone ("CapTel") phone.  Currently, the KDOC has TTY devices at some of their facilities.  A Tele Typewriter ("TTY") (also known as Telecommunications Device for the Deaf ("TDD") is a device that allows d/Deaf and hard of hearing individuals to communicate via phone lines using typed words. The TTY devices in use at KDOC are antiquated, functionally limited, and insufficient for many d/Deaf and hard of hearing inmates because, like the vast majority of Deaf people, they cannot communicate effectively in written English.  A VP would enable d/Deaf and hard of hearing inmates to communicate with other deaf individuals using sign language and permit real-time interpretation through the free Video Relay Service ("VRS") enabling them to communicate with individuals who do not know sign language.  A CapTel phone would permit d/Deaf and hard of hearing inmates with intelligible speech and proficiency in reading English to speak into the phone and then read the other individual's words, which are transcribed in real time and for free by a relay operator.  VPs and CapTel phones can be provided at either zero cost or minimal cost to d/Deaf and hard of hearing individuals.

3. To ensure that KDOC d/Deaf and heard of hearing inmates are notified of announcements, such as roll calls and PA announcements, KDOC must at least provide flashing lights, shake-awake alarms and visual notification systems.

4. To ensure that KDOC d/Deaf and hard of hearing inmates are notified of alarms or institutional emergencies at KDOC facilities, KDOC must at least install flashing strobe lights inside each d/Deaf and hard of hearing inmate's cell or install strobe lights that are clearly visible from inside each d/Deaf and hard of hearing inmate's cell.

As additional information becomes available, I expect to examine that material and expand upon the opinions offered in this report.

## 1. Defining *deafness*

Although it is often the case that those seeking to define or discuss deafness do so from a medical or audiological perspective, such a singular perspective significantly misses the mark. As Dr. Jerome D. Schein, an international authority on deafness, once stated, the meaning of deafness is best understood "when it is viewed as a social phenomenon rather than as a physical disability. To say this is not to deny the usefulness of studying deafness medically but rather to point out that such an approach tends to overlook how their deafness influences deaf peoples' daily lives, how the disability of deafness becomes a handicap." (Schein, 1996).[3] Schein defines deafness as "the common outcome of diverse causes resulting in an inability to hear and understand speech through the ear alone." The critical import of this definition is that it emphasizes communication – a quintessential function of human beings. This definition specifies that people who are deaf cannot hear *and* cannot understand speech, whereas people who are hard of hearing may be able to hear speech but cannot understand it (*i.e.,* cannot discriminate what is said). Even if they can hear loud noises and are aware that someone is talking, they are still deaf by this definition if they cannot understand the speech they hear. This functional definition then clearly and helpfully distinguishes the difference between those who are hard of hearing (those who have reduced hearing ability but can hear and understand speech) and those who are deaf (those who cannot hear *and* cannot understand speech).

The age at which one becomes deaf is critically important because this determines membership in one of two subsets within the larger class of deaf individuals. Childhood deafness creates significant obstacles to acquiring spoken language and becoming literate in English and is generally associated with a tendency to seek out and socialize with other deaf people, thus

---

[3] All secondary sources referenced in my report are listed in their entirety in the "References" section, beginning at page 40.

becoming part of the American Deaf Community. Adult onset deafness, on the other hand, generally does not interfere with speech and those who become deaf as adults generally do not seek out members of the American Deaf Community (*i.e.*, those early deafened) for companionship, nor do members of the American Deaf Community seek out late-deafened adults for companionship. This is because, although members of each subset are deaf, and although members of each subset rely upon visual not auditory means of communication, their life experiences have had different trajectories.

**Opinions with respect to defining deafness:**
- The meaning of deafness is best understood when viewed as a social and communicative phenomenon rather than simply as a physical disability.
- The class of people who are deaf cannot hear *and* cannot understand speech.
- Within the class of people who are deaf, there are two subsets: those who are deaf from childhood and those who become late-deafened.
- Although each subset is deaf and relies upon visual communication, their life experiences have been very different.

## 2. The American Deaf Community: A Linguistic and Cultural Minority

There is an identifiable subset of deaf people in America that is unable to rely upon hearing and speech as an effective and primary means of relating to the world and interacting with those who are not deaf. As children, some of these individuals, by virtue of parental decision or educational placement, are placed on a trajectory where they will spend their lives pursuing the goal of assimilating with the hearing and speaking majority of the population (*i.e.*, trying to "pass") to the extent possible. Others, however, are placed on a very different trajectory because they have been given or choose to embrace a different "center" for their lives–a Deaf center. These deaf individuals see themselves as Deaf. The written distinction between "deaf" and "Deaf," lower and upper case, has been used since 1972 to differentiate between those who are deaf and those who are deaf but who also identify as a member of a linguistic and cultural minority. (*See* Woodward, 1972).

Individuals who are Deaf use ASL and are fundamentally a visual people, with their own visual language, social organizations, history, and mores. They see themselves as members of the Deaf-World. Indeed, a case has been made that members of the Deaf-World should be viewed as an ethnic group rather than a "disabled" group. (Lane, Pillard & Hedberg, 2011). Contrary to the view held by most non-deaf people, Deaf people do not view their audiological condition as the

primary reality that binds them together as a Community. Although society in general may view their audiological condition as a defining element for Deaf people, what binds Deaf people together is their use of ASL. Deaf people are a linguistic and cultural minority that has been, and continues to be, communicatively disadvantaged by the hearing and speaking majority. (*See, e.g.*, Padden and Humphries, 2005; Lane, 1992; Jankowski, 1997; Wrigley, 1996). In short, these individuals, united by their use of ASL, are members of the American Deaf Community.

The use of ASL not only unites Deaf people but it also defines them as a linguistic minority. The primary reason for the central role of ASL in this linguistic minority is that, unlike any other means of communication available to Deaf people, ASL is the only means of communication that enables effective, efficient and reliable communication.

While some late-deafened adults do try to learn to sign, they often do so to compensate for the deteriorating intelligibility of their speech, to communicate with family members or friends who are learning to sign, or perhaps to communicate with Deaf people they may have met. However, learning to sign does not automatically mean that they wish to identify themselves as Deaf. Late-deafened adults usually continue to identify themselves as deaf–unable to hear, sharing an audiological condition and the need for visual means of communication with Deaf people–but they do not see themselves as having a linguistic and cultural identity. In other words, they generally do not see themselves as a member of the Deaf Community.

**Opinions with respect to the American Deaf Community:**
- d/Deaf people are unable to rely upon their hearing and speech as an effective and primary means of relating to the world and interacting with the majority.
- Members of the American Deaf Community have their own visual language: ASL.
- Deaf people are a linguistic and cultural minority that is communicatively disadvantaged by the hearing and speaking majority.
- ASL is central to determining membership in and defining the American Deaf Community.
- ASL is the only means of communication that enables effective, efficient and reliable communication for members of the American Deaf Community.

## 3. Deaf People as a Linguistic Community

Although the existence of an American Deaf Community is now undeniable, most people with little or no knowledge of or experience with d/Deaf people make a number of stereotypical and unfounded assumptions about d/Deaf people. (*See* Cokely, 2001; Spingarn, 2001). For

example, they wrongly assume that that "all deaf people can lip-read" or that "all deaf people can speak" or that "all deaf people are fully literate in English." While these are uninformed and naïve views of d/Deaf people, the long-standing and well-documented reality is that members of the American Deaf Community, as a group, do not use their speech for communication, do not lip-read English well and, as a group, have extremely limited competency in English.

However, as noted above, the most significant factor uniting and identifying members of the American Deaf Community is not whether a Deaf person uses speech, not the degree of hearing possessed by a Deaf person, and not competence in English. The most significant factor that identifies members of the American Deaf Community is whether a person uses ASL as his/her primary means of communication. In fact, a completely compelling case can be made that the use of ASL is *the* single-most important factor in defining the Deaf Community. Its use provides a means of determining acceptance into the Community, enables social interaction among members of the Community, and, through the use of ASL/English interpreters, provides a ready means of interacting with non-deaf people. The importance of ASL derives from the fact that it is a visually clear means of communication, one fully accessible to them, that enables Deaf people to have effective and efficient communication with each other and, by employing the services of an ASL/English interpreter, with the hearing and speaking majority.

Because of the essential nature of ASL in defining the American Deaf Community as a linguistic minority, it is important to address and dispel several misconceptions about ASL.

**3.1 American Sign Language.** That the use of ASL not only unites American Deaf people as a linguistic community but also separates them from those who use spoken English as their means of face-to-face communication is self-evident. Simply put, the language used by Deaf people in America is signed, not spoken, and even the most uninformed non-deaf people recognize that the two modes of communication are different.

However, although there are different international signed languages, ASL, for a number of linguistic, social and political reasons, has become a signed *lingua franca* for Deaf people worldwide, not unlike the role occupied by spoken English among non-deaf people worldwide. A primary reason for this is that ASL is the signed language that has been the most extensively researched and documented by linguists. As such, those who use the language professionally,

*e.g.*, ASL/English interpreters, are much more aware of the linguistic principles of ASL and how to use ASL to communicate clearly and effectively.

A primary misconception often held by those unfamiliar with ASL is that they assume it is simply a manual form of, or a derivative form of, spoken English. They assume wrongly. The lexicon (*i.e.,* the vocabulary) of a signed language refers, not to the words of a spoken language, but rather directly to the concept or meaning that Deaf people wish to convey. (*See* Baker-Shenk & Cokely, 1980; Valli, Lucas & Mulrooney, 2005). In ASL, signs refer not to English words, but rather to the concepts or meanings that its users wish to convey and exchange. For example, the ASL sign refers to an object (*e.g.,* a cat) and not to the English word for that object (just as the Japanese word "neko" refers, not to the English word "cat" but to the cat itself). Moreover, ASL has a lexicon and syntactic structure quite unlike that of spoken English. In simplest terms, there is not a one-to-one correspondence between American English words and the signs in ASL, as is true of any two languages, spoken or signed. Instead, ASL is a naturally evolved language used by members of the American Deaf Community and those non-Deaf people who have learned or acquired it. The linguistic evidence is clear and incontrovertible–ASL is structurally different from English. (Stokoe, 1965).

Another way in which ASL differs from English is that it does not have a conventionally accepted written form, *i.e.*, an orthography. This is true of all of the signed languages and many of the spoken languages in the world. There have been several attempts at creating a notation system for recording signed languages, the most notable of which is Stokoe notation system. (*See* Stokoe, et al 1965). However, like the International Phonetic Alphabet that is used to transcribe spoken languages, the use of Stokoe notation system has largely been restricted to linguists and is now being replaced by digital video recordings and computer programs that are being used to record and analyze signed languages (*e.g.*, Boston University's SignStream, http://www.bu.edu/asllrp/SignStream/; and SportsTec's StudioCode application, http://www.studiocodegroup.com/). A more widely used means of trying to record signs is "glossing" (*see, e.g.*, Baker-Shenk & Cokely, 1980), in which an English word written in all capital letters is used to refer to a sign. Thus the gloss "CAT" refers to the sign that is used to represent the concept "cat." Glossing has some severe limitations however. Unlike Stokoe notation, the reader of a glossed transcription must already know the sign being referred to in order to approximate the articulation of the sign that was glossed. Also the same gloss may refer

to two different variants of the same sign, since glossing does not capture articulatory behaviors. Despite these limitations, it is not uncommon for Deaf people to use glosses when writing notes or when communicating with a TTY. TTYs began as retrofitted, discarded Western Union teletype machines, hence the acronym TTY. Although they began as large, bulky machines, within a few short years they evolved into small computer-like devices, which make it possible for Deaf people to type to each other over existing phone lines; newer devices are referred to by the acronym TDD. (TDDs are now virtually obsolete because of the virtually ubiquitous presence of VPs within the Deaf Community).

However, glossing is not a written form of ASL, nor is it written English, even though the words may be English words. It is practically and linguistically inconceivable that a written two-dimensional form could reliably and easily capture three-dimensional moving, signed, conversational interactions. Analog and digital video recordings and the use of VPs (essentially internet signed communication using video web-cams) not only have rapidly replaced TTYs and the need for a written form of ASL, but also have provided a more accurate means of preserving and sharing signed interactions.

Deaf people as a group are unable to rely upon their hearing and speech as an effective and primary means of communication. Likewise, they also are unable to rely upon means of communication that are based on or derived from speech and hearing, such as written English, as an effective and primary means of communication. For Deaf people, the use of ASL is not simply a matter of convenience or preference. ASL provides the only effective and efficient means of linguistic communication for members of the Deaf Community.

**3.2 Limitations of English within the American Deaf Community**. It is clear and undeniable that members of the American Deaf Community embrace and accept ASL and that its use is central to defining and understanding the Deaf Community. It is also clear that Deaf people exist as a linguistic minority within a society in which English is the dominant language. However, there are significant challenges that Deaf people, as a group, face in becoming fluent in English. Some of these challenges are the same as those for any second language learner, but other, more severe challenges exist for Deaf people. Nevertheless, one of the widely held misconceptions about Deaf people is that although they do sign, they can read and write English fluently. As with other misconceptions about Deaf people, this has no basis in fact or reality.

11

While it certainly is a desirable goal for Deaf individuals to be competent in both ASL and English, the reality is that for the vast majority of Deaf people, competency in English is rarely attained. Certainly the history of the education of Deaf students attests to the fact that, for the vast majority of Deaf people, acquiring competence in spoken English is virtually unattainable. (*See, e.g.*, Marschark & Spencer, 2003; Wrigley, 1996; Lane, 1992). Also, the majority of Deaf people do not attain competency in reading and writing English because those forms of communication are derived from spoken English. According to Karchmer and Mitchell (2003), study after study concludes with the same overriding concern: "…the average performance on tests of reading comprehension for deaf and hard of hearing students is roughly six grade equivalents lower than their hearing peers at age 15." (*e.g.*, Allen, 1986; Traxler, 2000). The essential difficulty is that Deaf students are "…caught in a vicious circle: their impoverished vocabularies limit their reading comprehension and poor reading strategies and skills limit their ability to acquire adequate vocabulary knowledge from context." (deVillers and Pomerantz 1992). Thus, the commonly held misconception that Deaf people as a group can read and write English fluently is easily dismissed. The evidence is overwhelmingly clear: Deaf people, as a group, are not competent users of English.

However, it must be noted that the limited English proficiency of Deaf people is clearly not due to the condition of deafness, but rather is rooted in their limited language exposure in early childhood and a flawed educational pedagogy that has been in place for more than a hundred years. Ninety percent of deaf children are born to parents who are not Deaf and who generally do not sign. (Lane, 1992; Karchmer and Ross, 2003). Those deaf children grow up in a linguistically impoverished and deprived environment. They spend their critical language acquisition years surrounded by a language to which they have virtually no access. When they finally enter school (typically at the age of five or six), they are already linguistically five or six years behind their non-deaf peers. Then they are then put in an educational environment in which they are expected to learn to speak and lip-read a language (English) to which they do not have direct access, which is a virtually impossible task (imagine being placed in the center of Tokyo, being placed under a sound-proof glass dome and then being told to learn to speak and lip-read Japanese). Thus, starting out with a significant language deficiency, it should be no surprise that the average level of proficiency in English is significantly lower than their non-deaf peers.

Evidence that a linguistically impoverished and deprived environment, and not deafness itself, is the cause of limited English proficiency attained by Deaf people, as a whole, can be found in Deaf children who have Deaf parents. Deaf children of Deaf parents grow up in an environment in which they are exposed to ASL from birth and, just as children who have direct access to their parents' language, become fluent communicators in that language. Deaf children of Deaf parents then use their proficiency in ASL to acquire proficiency in English (not unlike second language learners who learn English). Studies have repeatedly shown that Deaf children of Deaf parents read and write English at or above grade level. So, while it is the case that Deaf people, as a group, are not competent users of English, Deaf children of Deaf parents are at the leading end of the curve. It is the fact that ninety percent of deaf children are raised in linguistically impoverished and deprived environments that results in the negatively skewed limited English proficiency curve, not their deafness. (*See, e.g.*, Lane, 1992; Marschark and Spencer, 2003).

Certainly, most Deaf people achieve what might be termed "survival" English. This means that, as a group, Deaf people have a level of literacy that enables them to interact with much of the routine written English language that they encounter in their daily lives. It is the repetitiveness, predictability and/or limited context within which this written English occurs that facilitates Deaf people's comprehension. For example, they read street signs, menus, subway directions, advertising posters and flyers and other basic printed material that is necessary or useful for them to live their lives on a daily basis. As a group, Deaf people might be described as marginal readers. That is, Deaf people do subscribe to newspapers and magazines, although many seek out those portions of the publications supported by visual material (*e.g.,* the comics page or advertising) or contain familiar arrays of numbers (*e.g., e.g.,* the sports page). However, one should not mistake this level of responding to basic English print in routine day-to-day tasks with a level of literacy sufficient to rely upon printed material to gain non-recurring or important information or to read most books or magazines.

Despite the fact that Deaf people interact with printed English at some basic level on an almost daily basis, it would be inaccurate and unsubstantiated to describe the level of literacy of the American Deaf Community as a whole as fluent. Deaf people do communicate via e-mail and TTY conversations, although those communications often read like written, *i.e.,* glossed versions of what they would sign. Deaf people do write notes to people who are not deaf, although their

notes are frequently misunderstood. However, just as in the non-deaf population as a whole, there is within the American Deaf Community a range of literacy.  The critical point is that the average literacy level of members of the American Deaf Community is significantly lower than and markedly more limited than it is for the population as a whole.

According to Mayberry, the median reading achievement of 17-21 year old deaf students leaving American secondary schools is at the 4th grade level…".” (Mayberry, 2002). Given this and given that literacy levels among the U.S. prison population are generally lower than those among the general population (Alaska Justice Forum 24(2): 2-4), one could reasonably conclude that the literacy levels among Deaf inmates would be lower than the non-deaf inmate population. In fact, given that the generally accepted definition of functional illiteracy is a level of reading and writing skills that is insufficient to manage tasks of daily living and employment that require a level of reading and writing beyond a basic level, one would expect that a greater proportion of Deaf inmates would be considered functionally illiterate than would be the case for the inmate population as a whole.

The difficulties that a limited level of literacy presents for Deaf people are clearly non-trivial. Consider, for example, that when one personality test was given to Deaf people using elementary English and again using ASL, the results were so different that the investigators concluded it was like giving two different tests. (Lane, 1992). This author goes on to describe the difficulties in administering psychological tests to Deaf people:

> Since Deaf test takers in America frequently are not fluent in English, they not only fail to understand test instructions thoroughly, invalidating the results, but also fail to understand the test content itself, as most tests are presented in written English, and in rather high-level English at that.
>
> One authority estimates that a tenth grade knowledge of English is needed to take most personality tests meaningfully. Yet only one deaf student in ten reads at eighth-grade level or better, and the average deaf student on leaving school has only a third grade command of English.

(Lane, 1992).

Deaf people, like most immigrant populations in this country, do attain a level of English that enables them to accomplish basic, routine and reoccurring tasks that involve written English. This variety of English has been called "Deaf English" (Charrow, 1974; 1975) which parallels, but is clearly not as proficient as, the English of those non-deaf people learning English as a second language.

14

It should be very clear that relying on standard written English as the primary or only means of communication with or for most Deaf people simply cannot be an effective means of communication.  It is the unquestionable ineffectiveness of speech, lip-reading and written English when communicating with Deaf people that makes the use of qualified sign language interpreters necessary for effective communication. The use of qualified sign language interpreters is also an important means of effective communication for those late-deafened deaf adults who have learned to sign.

**3.3 Limitations of Lip-reading and Speech within the American Deaf Community.** As challenging and ineffective as it is for Deaf people, as a group, to communicate in written English, it is even more challenging, ineffective and impractical for them to communicate successfully via lip-reading (also called speech-reading). Given the challenges Deaf people have in acquiring competence in written English, this should not be surprising. Unlike the permanent presence of the printed word that makes possible repeated readings, the spoken word is ephemeral. Given that Deaf people struggle for accurate and complete comprehension with the stationary written word, one cannot expect any greater level of competence or effectiveness when Deaf people try to comprehend the fleeting spoken word as it appears on the speaker's lips.

The common misconception that most non-deaf people have is that all Deaf people can lip-read. They mistakenly believe that, lacking one of their senses, the ability to hear, Deaf people's visual sense–and hence their ability to lip-read–becomes more acute in order to compensate. Most non-deaf people do not understand or appreciate the difficulties and limitations involved in trying to lip-read. It is extremely challenging to lip-read English because only a small fraction of the sounds used in the language are clearly visible. In fact, even someone who is fully fluent in and who has full auditory access to spoken English would struggle to lip-read English (non-deaf people have only to turn their television set to a Chinese or Russian language program and turn off the volume to experience this frustration firsthand). Consider the difficulty in trying to lip-read accurately the spoken English phrase "white shoes." To a person trying to lip-read this, the phrase could be understood as "white shoes" or "why choose." When we consider the fact that many of the sounds in English look the same to a lip-reader, it should not be surprising that Deaf people's comprehension of spoken language is usually quite poor and is always even worse than their competence in written English.

15

One has only to look at oneself in a mirror and soundlessly mouth each of the following pairs of words to have a sense of the impossibility of lip-reading accurately. In each of these pairs one of the words is listed on the Frye list of the one hundred most commonly occurring words in English. For example:

> to/you, in/thin, it/hit, he/she, on/don, are/car, with/width, his/is, i/eye,
> be/bee, or/ore, one/won, by/bye, but/butt, not/knot, your/door,
> an/ant, which/witch, do/due, their/there, out/shout, many/manny,
> then/ten, these/he's, so/sew, would/wood, like/lick, him/shim,
> time/thyme, two/too, more/moor, see/she, no/know, way/weigh,
> been/bin, oil/coil, and day/say.

Anyone soundlessly producing these word pairs quickly realizes how difficult it is to lip-read. According to Bernstein and Auer (2003): "Estimates of the upper extremes for the accuracy of lip-reading words in sentences have been as low as 10-30% words correct." This is in keeping with earlier work (Liben, 1978) that also found that speech-readers understand only about one fourth of what is said in dyadic,one-on-one, conversations.

Of course, there are a number of other uncontrollable factors besides the phonetic structure of English that make it extremely difficult for d/Deaf people to lip-read with any consistent degree of accuracy, such as,but certainly not limited to, a person's facial bone structure, facial musculature, facial hair, lighting, rate of speech. (Bernstein and Auer, Jr. 2003). Given the inherent linguistic difficulties in lip-reading and the additional complications that arise from external factors, it is no wonder that lip-readers' comprehension is so limited.

If speech-readers understand only approximately a quarter of what is said in dyadic, or one-to-one, conversations, it should not be surprising that the level of comprehension in small and large group interactions is significantly less. One reason for this is simply physical distance–the further away one is from a speaker the more difficult it is to discern fine muscle movements of the mouth necessary to lip-read. Another reason is that small group interactions in which a majority of the participants is not deaf generally rely upon turn-taking regulatory mechanisms that are auditorily determined, *i.e.*, whoever talks first or loudest claims the floor. This places the d/Deaf lip-reader in an impossible position of trying to track who is speaking by waiting for others in the group to look at the person who is speaking. Deaf people trying to lip-read in small group interactions must constantly determine who is talking by trying to determine who other

group members are looking at. By the time the d/Deaf person has determined who is speaking, the d/Deaf person has already missed the first several seconds of what the speaker has to say. This also means that it is difficult for the d/Deaf person to track who will next claim the floor and is often unable to claim a turn him/herself. Large groups pose even greater problems for the lip-reader: problems such as greater physical distance from the primary speaker, whether or not the primary speaker moves about while talking, variable lighting, and the impossibility of lip-reading questions or comments from anyone in the large group.

When interacting with deaf people who rely on lip-reading to interact in a given situation, one must exercise extra caution to ensure whether the deaf person has actually understood. This is because deaf lip-readers will often nod their heads, which the non-deaf interlocutor takes as a sign of comprehension. However, this is no different than second language users who engage in the same behavior. For example, students who are just learning ASL will often and regularly engage in this behavior when communicating with deaf people. They do this, and d/Deaf people do this, not to deceive the other person, but rather to "save face." That is, they do not want the other person to think they are "stupid" or incompetent. Their reasoning is that if they actually interrupt the other person each time they do not understand, that is precisely the impression they will be creating. They would rather accept the consequences of not comprehending than create an impression of incompetence.

Ideally, someone interacting with a deaf person who is relying on lip-reading must be aware that head nodding may not always signal comprehension. Unfortunately this is rarely the case. The result is that the two interlocutors leave the interaction with two different impressions of the interaction. The deaf person leaves with "comprehension gaps" while the non-deaf person leaves thinking that the deaf person has fully comprehended.

Given lip-readers' limited comprehension in one-to-one interactions and given the increased interactional complexities in small and large group interactions, lip-reading cannot be assumed to be an effective and meaningful communicative option for d/Deaf people in such settings. Some late-deafened individuals may be able to read lips better than those who become deaf at an early age.  However, their ability to do so is often limited to very controlled conditions (with factors listed above also negatively impacting their lip-reading accuracy) that are unlikely to be present in a prison environment. This is, in part, because, unlike those with childhood onset deafness, they have greater competence in spoken English to assist them in making educated

guesses. Unfortunately, their higher degree of accuracy at lip-reading coupled with their quite intelligible speech often leads people who are not deaf to conclude that the late-deafened individual is only pretending to be deaf and thus no special communication accommodations are needed or warranted, when, in actuality, late-deafened people also require accommodations to engage in effective communication and receive equal access to, for example, programs and services.

Of course even if d/Deaf people could lip-read with any reasonable level of accuracy, successful communication in those settings would also require that they then express themselves in intelligible spoken English that, unlike late-deafened adults, they cannot do. Some Deaf people have speech that may be understood in limited contexts; most, however, do not. Despite years of speech training, most Deaf people are generally unable to regulate the volume, timbre or pitch of their speech and that, among other factors, makes their speech very difficult to understand. Deaf people, never having heard themselves speak, cannot monitor their speech in the way that non-deaf people can. Simply put, Deaf people do not know how words are supposed to sound; without such an auditory target they can only approximate the vocal formulation of words. Thus, the speech of Deaf people has been described as guttural, animalistic, and unintelligible.

Clearly, Deaf people know that their speech is ineffective as a primary means of communication; they know that those unfamiliar with "Deaf speech" have great difficulty understanding their speech; they know not to trust their speech for important interactions; they know that their speech sounds unnatural; and they know that non-deaf people react negatively when they do use their speech. Thus, unlike late-deafened adults, most Deaf people choose not to use their speech for routine communicative interactions because they know it is unintelligible and therefore not an effective means of communication, or in many cases they simply cannot use their speech.

Late-deafened adults are very likely to have intelligible speech and, because of their proficiency in English, are able to lip-read with slightly better accuracy. As noted, this often leads people who are not deaf to assume that the late-deafened adult is "faking" their deafness. The conflation of speech and perceived hearing ability and thus "appearing" not to be deaf dates back to the Emperor Justinian (527 – 565 BCE), whose Justinian Code (*Corpus Juris Civilis*)

created categories of deaf people, placing a premium on those who became deaf later in life but who could speak. From that time on, according to the Code, the ability to speak was what counted as being viewed as "equal" to those who were not deaf. Thus to be able to speak intelligibly and, to the extent one could, lip-read enabled a person to "pass" for being "normal" (*i.e.,* someone who is not deaf).  But, as noted above, late-deafened adults who retain reasonably intelligible speech present a false image to those who are not deaf. They "sound normal" and so the conflation of speech and hearing becomes significant ("if you speak that well, I assume you must be able to hear as well"). That audist stereotype often leads to late-deafened adults being misunderstood and discriminated against because they cannot successfully engage in "normal" communication. That is, while they can express their thoughts in intelligible English, given the severe limitations of lip-reading and their lack of hearing, they are unlikely to understand what is said to them in response to their ideas or receive auditory signals from loudspeakers or people who are not within their line of vision.

For d/Deaf people as a group, then, lip-reading and speech cannot be assumed to provide a reliable and accurate means of communication in most interactions. It is certainly true that in some context-specific social interactions a variable combination of speech, lip-reading, written words and gestures may enable a rudimentary level of low stakes, social communication (*e.g.,* "change the TV channel," "pass the salt," "lights out"). However a variable combination of speech, lip-reading, written words and gestures would definitely not ensure effective communication in what would be termed "high stakes" interactions. "High stakes" interactions are those in which the risks of miscommunication or misunderstanding are high and the consequences of miscommunications have significant, and possibly severe, negative repercussions for the d/Deaf individual.

Any list of "high stakes" interactions would certainly have to include disciplinary and/or investigative proceedings, medical appointments, mental health appointments (both individual and group counseling sessions), psychological evaluations, any formal evaluation (*e.g.,* behavioral, educational, occupational), education sessions (*e.g.,* specific training sessions, general educational opportunities), rehabilitation programs (*e.g.,* Narcotics Anonymous, Alcoholics Anonymous, transition programs), important announcements (*e.g.,* "count," instructions over loudspeakers) and instructions concerning health and safety. What these "high stakes" interactions have in common is that discussions, suggestions, courses of action and

19

reliable decisions simply cannot be considered valid unless one can ensure that any communication between parties was conducted in a manner that was accurately conveyed and understood. Given the unreliability of lip-reading, speech and written communication that exists for d/Deaf people, one simply cannot conclude that relying solely on one or more of those forms of communication can result in accurate and effective communication in "high stakes" interactions.

The clear reality is that the only practical way for Deaf people and for many deaf people to participate effectively in these types of "high stakes" one-to-one interactions and in any small or large group interaction is to employ the services of a qualified sign language interpreter.

Because of the importance of qualified sign language interpreters in ensuring access and participation, the next section will examine several aspects of sign language interpretation and misconceptions about the nature of sign language interpreting.

**Opinions with respect to Deaf People as a Linguistic Community:**

- Those with little or no knowledge of d/Deaf people or ASL make numerous unfounded, stereotypic assumptions about d/Deaf people, their means of communication and their signed language.

- The most significant factor uniting members of the American Deaf Community is the use of ASL.

- ASL is neither a manual form nor a derivative form of English and thus there is not a one-to-one correspondence between American Sign Language signs and English words.

- The grammatical and syntactic structure of ASL is quite different than the grammatical and syntactic structure of English.

- There is no conventional written form of ASL.

- As a group, Deaf people face severe challenges in acquiring competency in spoken or written English and most Deaf people rarely attain competency in spoken or written English.

- The average literacy level of the American Deaf Community is significantly lower than and more limited than it is for the population as a whole.

- Lip-reading is so unreliable that it cannot be used to ensure comprehension and effective communication in any group setting or any "high stakes" one-on-one setting.

- The use of speech for the vast majority of Deaf people is so ineffective that it cannot be relied upon to ensure accurate expression and effective communication in all but the most restricted one-to-one interactions.

- Late-deafened adults who have reasonably good lip-reading and speech skills, because of their previous exposure to spoken English, are often incorrectly, thought to be feigning deafness.

• The only way for Deaf people and for deaf people who have learned sign language to participate meaningfully and effectively in all group interactions and all "high stakes" one-to-one interactions (*i.e.,* interactions related to health, safety, discipline and the like) is to provide a qualified sign language interpreter.

## 4.  Sign Language Interpretation: Misconceptions and Certifications

Given the passage of federal laws beginning in the early 1970s, including the Rehabilitation Act of 1973, that require equal access and effective communications for d/Deaf people, it is safe to say that most non-deaf people have, at one time or another, seen a sign language interpreter. However, as with other aspects of the lives of d/Deaf people, there are several misconceptions and naïve assumptions surrounding sign language interpreters.

The first is the belief that anyone who can sign can be a qualified sign language interpreter. The fact is that competence in ASL is a necessary, but not sufficient, condition to become a qualified sign language interpreter. This necessary, but not sufficient, condition of bilingualism is true for all interpreters whether of spoken or signed languages and the literature is quite clear on this point. (*See, e.g.*, Seleskovitch, 1978; Frishberg, 1986; Wadensjö, 1998; Cokely, 1992; Stewart et al, 1998; Janzen, 2005).

Another common misconception held by those who are not Deaf is that ASL is easy to learn and thus one can rather quickly become a qualified sign language interpreter. They mistakenly think that ASL is nothing more than making pictures in the air and thus can be learned quickly and easily. However, the fact is that learning ASL is as challenging as learning any spoken language; in fact, given the modality differences, many non-deaf students find it more challenging to learn ASL than to learn a spoken language. (Peterson, 1999).

Another misconception about sign language interpreting is that signs exist in a one-to-one relationship with English words; that is, the misconception is that for every word there is a sign that conveys that word. Were this true, it would mean that interpreting would consist simply of learning the matched signs for the words one already knows and the rather mechanical process of producing the linked signs for the words one hears and, conversely, the spoken words for the signs one sees. However, anyone who has studied another language knows that the vocabularies of any two languages do not map in a one-to-one relationship; this is a cross-cultural and linguistic reality well supported by the literature. (*See, e.g.*, Larson 1998; Lyons, 1977; 1995; Duranti, 1997; Crystal, 1997; Hatim and Mason, 1997; Weaver, 1997). This is particularly true

for ASL and spoken English. (*See, e.g.*, Stokoe, 1965; Cokely, 1992, 2001; McIntire (ed) 1986; Mindess, 1999).

To begin to understand the cognitive challenges and complexities of interpretation, and why competence in ASL is a necessary, but not sufficient prerequisite in itself, to qualify one as an interpreter, it is helpful to have a clear statement of what interpretation is. The following definition provides such a starting point:

> Interpretation is the competent and coherent use of one naturally evolved language to express the meanings and intentions conveyed in another naturally evolved language for the purpose of negotiating an opportunity for a successful communicative interaction in real time within a triad involving two principal individuals or groups who are incapable of using, or who prefer not to use, the language of the other individual or group.

Cokely, 2001.

This is a general definition of interpretation that applies to signed and spoken language interpretation and one that is well supported in the literature. (*See, e.g.*, Robinson, 1997; Wadensjö, 1998; Larson, 1998; Stewart et al, 1998; Pöchhacker, 2004; Janzen, 2005). This definition places in proper context the necessary, but insufficient, condition of bilingualism needed to interpret. Indeed, it is the ability to determine and then express meaning and intention that is at the heart of interpretation.

The cognitive processes by which meaning and intention are determined and then expressed in a different language are quite complex. It has only been in the last quarter of a century that we have begun to understand the process of interpretation; demands of which are such that interpretation has been called "…probably the most complex type of event yet produced in the evolution of the cosmos." (Richards, 1953). While some may say this is hyperbole, it is undeniable that interpretation is an extremely complex cognitive task. In the past three decades, various models of the cognitive process have emerged that have helped shape and guide our understanding of interpretation, research into interpretation, and the training of interpreters (*See, e.g.*, Moser-Mercer, 1978; Chernov, 1978; Cokely, 1984, 1992; González et al, 1991). Examining any of these models makes clear the fact that excellent skill in both languages is unquestionably a necessary, but not sufficient, prerequisite for interpreters. In fact, in the case of qualified sign language interpreters, national certification by the Registry of Interpreters for the Deaf evolved, in part, to differentiate between those who could sign and those who could interpret. (Cokely, 2005).

Interpretation generally takes one of two forms–consecutive or simultaneous. Consecutive interpretation often happens in one-to-one interactions such as doctor's appointments, supervisor meetings and in some legal settings. In diplomatic situations, it may be used when delegates or diplomats deliver speeches. In consecutive interpretation, one of the participants speaks or signs and, at a logical semantic or syntactic point, pauses. The interpreter, who may have been taking notes, then begins to interpret what was just said or signed. When the interpreter is done, the speaker continues until the next pause at which time the interpreter begins. This alternating pattern continues until the speaker is finished. In general, interpreters and participants agree beforehand that the interpretation will proceed consecutively. In one-to-one interactions, the logical pause points may, for instance, be the conclusion of one of the participant's turns (*e.g.* asking a question).

Simultaneous interpretation happens without benefit of regular and planned pauses. In simultaneous interpretation the interpretation is delivered in the same general time frame as the original. The term "simultaneous" interpretation is actually a misnomer. No interpretation is delivered perfectly synchronous with the delivery of the original message. Because the interpreter's goal is to render the meaning and intent of the original, the interpreter must first comprehend the original message. To do so requires that the interpreter wait to receive enough of the original message so that the interpreter is confident in the intended meaning of the speaker or signer. Thus, there is always a small temporal discrepancy between the production of the original message and the production of the interpretation of the original message because interpreters must necessarily chunk information that is coming to them. This temporal difference is called lag time or sometimes by the French term *décalage*.

For at least the last four decades, it has been widely accepted within the Deaf Community and among those who work with Deaf people, including interpreters, that for non-social communicative interactions between Deaf people and those who are not deaf and who cannot sign fluently, consecutive or simultaneous interpretation is the only viable option to ensure that Deaf people have effective communicative access and have reliable opportunities for participation. No other reasonable accommodation at the present time can successfully enable Deaf people and those deaf people who can sign to participate in and benefit from small and large group interactions in real time. One has only to look at the prevalence of interpreters in the education, business, religious, entertainment and social service segments of American society to

23

realize the widespread recognition and acceptance of the reality that interpreters are the only viable option for Deaf people in such settings. The presence of on-camera interpreters during Mayor Bloomberg's regular broadcasts to citizens of New York City during Hurricane Sandy and the growing national discussion about provision of interpreting services during emergency situations are clear indications of the recognition of the importance of interpreters for effective communication for d/Deaf people. At the other end of the spectrum, there is the national and international attention given to the failure to provide interpreting services and the use of a faux interpreter at the funeral services for Nelson Mandela.

Late-deafened adults who have learned to sign also benefit from and rely upon the services of qualified sign language interpreters. Such individuals often rely upon the combination of the interpreter's signs and lip-reading the interpreter or the speaker in order to have effective and reliable communicative access, both in small or large group and one-on-one settings. This augmented communication is necessary given the fragmentary nature of lip-reading and the likely fragmentary comprehension of signs by someone who is late-deafened.[4] These sources of information work together in a complementary fashion to ensure a greater level of comprehensibility that either one does alone. Moreover, when acquiring a second language, the norm is that one's comprehension of that language always outpaces one's production of that language (think of young children who can always understand more than they can express). Accordingly, late-deafened adults who learn sign language generally comprehend the signs of qualified sign language interpreters better than (and faster than) the adult can produce the signs themselves.    Thus, provision of competent interpreters is often necessary to provide communicative rights and access to someone who is late-deafened.

The national professional organization for qualified sign language interpreters in the United States is the Registry of Interpreters for the Deaf (http://www.rid.org).  Founded in 1964, the Registry of Interpreters for the Deaf ("RID") currently has more than 12,000 members nationwide. In 1972, the RID implemented a national evaluation and certification system that would provide a ready means of identifying those individuals deemed qualified to interpret. As mentioned previously, the certification system was motivated, in large part, by an expressed need to differentiate between those who could sign and those who could interpret. (Cokely, 2005). For the past twenty-five years, the assessment procedures have been implemented, revised and

---

[4] This is also one of the reasons why late-deafened individuals benefit greatly from ASL classes, which improve their fluency in the best communication method available to them.

monitored using acceptable psychometric procedures to ensure their validity and reliability. (http://www.rid.org).

The RID also certifies interpreters to work in legal settings. According to the RID's 2007 *Standard Practice Paper on Legal Interpreting*:

> Legal interpreting encompasses a range of settings in which the deaf person interacts with various parts of the justice system. Legal interpreting naturally includes court interpreting; however, a legal interpreter's work is not restricted to the courtroom. Rather, legal interpreting occurs during attorney- client conferences, investigations by law enforcement, depositions, witness interviews, real estate settlements, court-ordered treatment and education programs and administrative or legislative hearings. Legal interpreting requires highly skilled and trained specialists because of the significant consequences to the people involved in the event of a failed communication.

RID, 2007.

National assessment and certification of interpreters is a significant factor in assuring that an individual possesses the range of competences and capabilities needed to render effective interpretation. All languages exhibit sociolinguistic variation. Sociolinguistic variation will include, for example, age variation (senior citizens and teenagers may use different vocabulary items), gender variation (men and women may use different vocabulary items and grammatical structures) and geographic variation (people from different parts of the country may have distinct accents and/or linguistic patterns). Despite such natural variation, teenagers still communicate with senior citizens, men communicate with women, and people from different parts of the country communicate with each other. The critical point is that naturally occurring sociolinguistic variation does not impede communication among different members of a linguistic community.

ASL, as is true of all signed and spoken languages, also exhibits natural sociolinguistic variation (*e.g.*. Woodward, 1994; Lucas, 2001). This means, for example, that older Deaf people may sign slightly differently than younger Deaf people, Deaf people from the North may sign slightly differently than Deaf people from the South, and Deaf people from various educational backgrounds may sign slightly differently from each other. Nevertheless, just as with spoken English, such naturally occurring linguistic variation does not, in any way, preclude Deaf people from communicating with each other. Certification of interpreters at a national level provides a readily identifiable measure of assurance that the certificate holder possesses the knowledge and

communicative flexibility necessary to interpret successfully for groups of diverse Deaf people that embody naturally occurring sociolinguistic variation.

Within the past decade as VideoPhones have become more ubiquitous, Video Remote Interpreting has become more frequently used as a means of providing d/Deaf and hard of hearing people with access to interpreters. VRI service is an on-demand service, available seven days a week, twenty-four hours per day, and some companies will bill only for minutes used rather than to the nearest half hour. Having readily available VRI will enables hospitals and lae enforcement entities to provide "an interpreter who is able to interpret effectively, accurately and impartially both receptively and expressively, using any necessary specialized vocabulary" (http://www.ada.gov/taman3.htm) where they are unable to find a live interpreter within a reasonable amount of time.

**Opinions with respect to Sign Language Interpretation:**

- Competence in ASL and English is a necessary, but not sufficient, condition to become a qualified sign language interpreter.
- The cognitive processes involved in interpretation are extremely complex and require the ability to determine meaning and intent.
- For non-social communicative interactions between Deaf people and those who are not deaf and who cannot sign fluently, consecutive or simultaneous interpretation provided by a qualified interpreter is the only viable option to ensure that Deaf people have effective communication access and have reliable opportunities for participation.
- Certification of interpreters at a national level provides a readily identifiable measure of assurance that the certificate holder possesses the knowledge and communicative flexibility necessary to interpret successfully for groups of diverse Deaf people that embody naturally occurring sociolinguistic variation.
- Late-deafened adults who have learned to sign greatly benefit from and rely upon the services of qualified sign language interpreters.
  Video Remote Interpreting (VRI) is, in some situations an option for providing competent interpreting services

## 5. d/Deaf and hard of hearing inmates at KDOC

Based on my forty-six years of experience and a review of documents provided to me (*see* **Exhibit B**), there are several areas involving lack of communicative rights and access for d/Deaf and hard of hearing inmates incarcerated by the KDOC ("KDOC d/Deaf and hard of hearing inmates") that warrant examination and discussion. While it is true that KDOC d/Deaf and hard of hearing inmates have audiological and linguistic differences that set them apart from

the general KDOC inmate population, it is true that their audiological, linguistic and life experience differences are not completely identical. Nevertheless, despite the fact that KDOC d/Deaf and hard of hearing inmates' audiological, linguistic and life experience differences are not completely identical, *all* KDOC d/Deaf and hard of hearing inmates require visual accommodations in order to provide them with effective and efficient communicative access.

**6. Necessary Changes Regarding Treatment of d/Deaf and Hard of Hearing Inmates**

a) **Defendants' prevailing view of d/Deaf and hard of hearing inmates:** It is quite clear from statements in various documents that the prevailing view within KDOC is that d/Deaf and hard of hearing inmates have "medical issues." This means that communication difference and the need for visual communication is not seen as the primary identifying difference between d/Deaf and hard of hearing inmates and the general inmate population. The fact that Defendants view deafness as a medical issue and not a linguistic or communicative difference has profound, and negative, effects regarding the provision of communicative access and effective communication for d/Deaf and hard of hearing inmates.

Defendants provide no training for KDOC employees regarding Deaf and Hard of Hearing inmates. (Response to First Set of Interrogatories #5). I believe that Defendants must provide regular orientation and training sessions to KDOC personnel (*e.g.,* officers, counselors, and medical personnel) that present the communicative access rights and needs of d/Deaf and hard of hearing inmates from a social and communicative perspective rather than the uninformed default which is simply an audist, medical perspective. Training should include, but not be limited to sessions that address the communication and access needs of d/Deaf and Hard of Hearing people and why deafness is best viewed from a socio-cultural perspective not a medical perspective.

b) **Defendants' assessment of effective communication with d/Deaf and hard of hearing inmates:** Based on my review of materials provided to me, it is clear that Defendants rely upon several misguided sources for determining effective means of communication with d/Deaf and hard of hearing inmates. First, there is reason to believe that KDOC personnel do not understand what *effective* communication means or they rely upon stereotypes

27

discussed above for determining how to communicate with d/Deaf and hard of hearing inmates. I believe that among the stereotypes are the assumptions that there are no communication problems or barriers and/or that d/Deaf and hard of hearing inmates can read lips "really well" or that they can hear.

In none of the materials I reviewed was there any information describing how Defendants assess whether communication with d/Deaf and hard of hearing inmates is effective, nor any information on how Defendants determine whether d/Deaf and hard of hearing inmates comprehend. Given the absence of training (see Response to First Set of Interrogatories, #5) it is unclear how KDOC staff can make such determinations reliably. Additionally, KDOC personnel apparently operate on the erroneous assumption that medical personnel are qualified to make an assessment of the communication abilities and needs of d/Deaf and hard of hearing inmates. This clearly stems from the fact that the KDOC views deafness as a medical issue and not a communication difference.

What is most notable and troubling by its very absence is the fact that none of the material I reviewed indicates that KDOC personnel ask d/Deaf and hard of hearing inmates themselves what means of communication is most effective for d/Deaf and hard of hearing inmates. Minimally, in attempting to determine the communication needs of d/Deaf and hard of hearing inmates, it is most reasonable to believe that the inmates themselves should be consulted on what means of communication are effective for them. The practice of not involving d/Deaf and hard of hearing inmates in identifying their own effective communication creates and reinforces a pejorative and uninformed audist view that d/Deaf and hard of hearing inmates do not know what constitutes effective communication for them.

I believe that Defendants must develop procedures and implement procedures that ensure that each d/Deaf and hard of hearing inmate is involved in any decisions about what constitutes effective communication for that specific inmate. I also believe that those determinations must be recorded on a centralized list that is accessible to responsible KDOC personnel. Thus if/when a d/Deaf and hard of hearing inmate is transferred to a new facility that facility will already be aware of what constitutes effective communication for that specific inmate.

At minimum, facilities should appoint an ADA coordinator to receive requests from d/Deaf and hard of hearing inmates, rather than requiring inmates to go through a

grievance procedure in order to receive accommodations, which, as evidenced by the grievances produced by Defendants, are often denied or are responded to with means that do not provide effective communication or access.

c) **Defendants' inability to ensure communicative access for d/Deaf and hard of hearing inmates:** Based on my forty-six years of experience, and my review of material provided to me, it is clear that Defendants have failed to take adequate steps to ensure that d/Deaf and hard of hearing inmates in the KDOC system are being provided effective communication. For example, the fact that Defendants vest each Warden with the responsibility to determine accommodations (see Response to First Set of Interrogatories, #3) means that Defendants are treating KDOC's d/Deaf and hard of hearing inmates differently depending upon the facility at which they happen to be housed. Moreover, based on the interrogatory responses, it does not appear that any individual facilities have developed any standard procedures for dealing with d/Deaf and hard of hearing inmates. Accordingly, how effective communication is implemented may differ slightly from facility to facility (*e.g.*, where a VP is placed) and even within a facility because of the lack of guidance given to KDOC staff. What remains constant is that no facility appears to provide effective communication and access for d/Deaf and hard of hearing inmates.

This systematic inconsistency is evident in Defendants' interrogatory response that two facilities (Blackburn Correctional Complex and Luther Luckett Correctional Complex) provide VPs and "Some inmate [sic] at the Kentucky State Reformatory have pocket talkers."

I believe that Defendants must designate a responsible individual who can act proactively and regularly in order to ensure that KDOC facilities and accommodation decisions are ADA compliant. Minimally, this would include a quarterly statement and review of all KDOC accommodation decisions for those protected by the ADA, including decisions regarding the communicative rights and access needs of d/Deaf and hard of hearing inmates. Absent a single, assertive compliance point of responsibility (*i.e.,* an ADA compliance officer), I believe that Defendants cannot ensure that its facilities are reliably and consistently providing effective communication and appropriate access for d/Deaf and hard of hearing inmates, or that Defendants will continue to be up to date and compliant with regard to relevant laws.

d) **Defendants' failure to provide necessary visual alarms and/or signals:** Based on my review of materials provided to me, I believe that Defendants have failed to provide visual alarms and/or signals, and that such failure poses significant risks for d/Deaf and hard of hearing inmates. KDOC reports that only one of its facilities, Western Kentucky Correctional Complex, has flashing strobe lights for alarms. (*See* Response to First Set of Interrogatories, #20).

  The lack of adequate visual alarms and/or signaling devices in cases of emergencies poses serious and potentially fatal risks for d/Deaf and hard of hearing inmates. The absence of visual alarms means that d/Deaf and some hard of hearing inmates are unable to respond on their own and with the same level of swiftness as non-d/Deaf inmates. Apparently, in the absence of visual alarms, KDOC relies upon KDOC officers and/or non-d/Deaf inmates to alert d/Deaf and hard of hearing inmates of an alarm. In my opinion, reliance upon KDOC officers and/or non-d/Deaf inmates to alert d/Deaf and hard of hearing inmates is a misguided practice that poses potentially serious risks for d/Deaf and hard of hearing inmates and disadvantages them vis-à-vis inmates who are not d/Deaf or hard of hearing.

  It is very clear that, as a group, d/Deaf and hard of hearing inmates are unable to hear and thus unable to respond to spoken announcements or "move/call" signals that are made over a PA system or yelled out by officers. While some hard of hearing inmates, when they have their hearing aids on, may know that an announcement is being made (sound localization) they are unable to understand the contents of that announcement. Thus, as a group, d/Deaf and hard of hearing inmates have no access to information, some of which is potentially life-threatening, that is available to all other inmates. In order for d/Deaf and hard of hearing inmates to be provided with the same level of information, independence and communicative access as non-deaf and hard of hearing inmates, it is my opinion that visible, lighted signal boards must be provided in each of the living quarters. In addition, KDOC should also consider installing bed-shaking devices that would vibrate and physically notify d/Deaf and hard of hearing inmates in the event an emergency occurs while those inmates are asleep.

  I believe that Defendants must install visual alarms and signals in all common areas (*e.g.,* visiting areas, medical areas, employment areas, classroom areas, library

areas), and in the cell/room of each d/Deaf and hard of hearing inmate or in a location that is clearly visible from all parts of the cell/room.

In addition to a simple strobe light, Defendants should also install auxiliary devices, *e.g.,* signal boards, that would alert d/Deaf and hard of hearing inmates to the nature of what is being signaled (alarm, lock down, meals, roll call, etc.), so that inmates can also have effective communication and access to information concerning announcements.

e) **Defendants' failure to provide interpreters and to ensure effective communication:**
Based on my 46 years of experience and review of materials provided to me, I conclude that Defendants have failed to provide sign language interpreters for interactions involving d/Deaf and hard of hearing inmates. As noted above, d/Deaf and hard of hearing inmates need qualified sign language interpreters in order to communicate effectively in all group interactions and in all "high stakes" one-on-one interactions. While the common perspective is that it is d/Deaf and hard of hearing inmates who require the services of an interpreter in order to communicate effectively, the fact is that KDOC personnel need interpreters as much as the d/Deaf and hard of hearing inmates do. It is not simply one party in an interaction who needs interpretation services; interpreters are needed because the participants do not have a shared language and thus cannot communicate directly or effectively with each other. An interpreter is needed not just because someone is d/Deaf or hard of hearing; an interpreter is needed because counselors, doctors, hearing officers, etc. do not know ASL and because d/Deaf and hard of hearing inmates do not have reliable access to spoken English. KDOC's failure to provide interpreters makes it clear that it does not view provision of interpreters as necessary for its personnel to do their jobs. Absent the provision of interpreters, Defendants cannot claim that its counselors, doctors, hearing officers, etc. are able to communicate effectively with d/Deaf and hard of hearing inmates in group and in all "high stakes" interactions.

It is most telling that Defendants acknowledge that only "in some situations" do Defendants arrange for interpreters through the Kentucky Commission on the Deaf and Hard of Hearing. (Response to First Set of Interrogatories, #20). Moreover, inmate

grievances make it clear that Defendants are, at best, inconsistent in providing interpreters in group and "high stakes" interactions.

It is worth stressing that there is a difference between "social signers" (*i.e.*, individuals who know how to sign and may, in some very limited and low risk situations be able to facilitate communication between d/Deaf and hard of hearing people and non-deaf people) and qualified, certified interpreters. The level of competence achieved by these "social signers," such as KDOC staff members (see Response to First Set of Interrogatories, #20) or other non-deaf inmates, is clearly not the level of fluency required to interpret with accuracy, fidelity and fluidity, which are necessary for effective communication.

Without proper training, these "social signers turned interpreters" are likely to be unaware of the linguistic and structural differences between ASL and English. Without proper training, these "social signers turned interpreters" are likely to think that the goal of interpreting is nothing more than rendering a sign for each word they hear or vice versa. They do not realize that the essence of interpretation lies in determining meaning and intent and, as discussed above, discarding the form (*i.e.,* the words or signs) of the original message. Additionally, without proper training, these "social signers turned interpreters" are likely to be unable to manage and control lag time in order to deal with more structurally dense or complex messages.

Another, perhaps more important issue that must be considered is that employee "social signers turned interpreters" will often have an interest in the material that they are signing or speaking. Someone acting as an interpreter who has a vested interest in the outcome of an interaction (*e.g.*, a disciplinary meeting) will be unable to maintain the level of neutrality and objectivity required to accurately communicate the interaction. By contrast, certified interpreters provide a level of measured, objective neutrality in their work. Like doctors and lawyers, certified interpreters are bound by a professional code of ethics and conduct and pledge to maintain confidentiality, neutrality, impartiality and objectivity in their work (http://www.rid.org/ethics/code/index.cfm); "social signers turned interpreters" are bound by no such code of ethics or ethical code of conduct.

To the extent that Defendants rely upon "staff members who know sign language and provide assistant [sic]" (see Response to First Set of Interrogatories, #20) to serve as interpreters in  "high stakes" one-on-one interactions KDOC cannot claim that it is

32

providing d/Deaf and hard of hearing inmates with effective communication. I believe that in order to have meaningful and effective communication between KDOC employees and d/Deaf and hard of hearing inmates in all group interactions and in all "high stakes" one-on-one interactions, including health care appointments, hearings, and, for example, educational, rehabilitative and therapeutic programming throughout the KDOC system, Defendants must provide sign language interpretation by qualified sign language interpreters.

f) **Defendants' provision of only TTY/TDDs to communication with individuals outside of the prisons is problematic and ineffective:** Based on my experience and my review of materials, I believe that Defendants' current practices and procedures for providing d/Deaf and hard of hearing inmates TTYs disadvantage d/Deaf and hard of hearing inmates and afford d/Deaf and hard of hearing inmates with significantly less telephonic access than inmates who are not d/Deaf or hard of hearing.

Here it must be noted that TTYs have been used by d/Deaf and hard of hearing people since the early 1970s. These devices enable for d/Deaf and hard of hearing people to communicate over existing telephone lines by using the keyboard in the TTY to send acoustic signals that are then converted into text by the recipient's TTY. There are several limitations to TTYs, however. One limitation is that this direct point-to-point TTY communication requires that both parties have TTYs. Although TTYs and free, federally mandated TTY relay services have, in the past, provided a significant level of communication access for d/Deaf and hard of hearing people, the fact is that TTY technology has rapidly become obsolete and inefficient for reasons discussed below. Because TTYs are rapidly becoming obsolete, it is increasingly unlikely that those with whom KDOC d/Deaf and hard of hearing inmates wish to communicate will even have TTYs. Also because a TTY conversation is typed, TTY conversations always take significantly more time than if the conversation had been spoken or signed.

In addition to the limitations described above, for different reasons, a TTY does not provide KDOC d/Deaf and hard of hearing inmates with effective communication with those outside KDOC. In order to use a TTY effectively, the user must be proficient in written English and, as described above, many d/Deaf and hard of hearing inmates do not communicate effectively in English. For many d/Deaf and hard of hearing inmates

who have intelligible speech and proficiency in reading English, new telephone technology exists that would provide them with a level of communicative access equivalent to other inmates. This technology, CapTel, allows a d/Deaf or hard of hearing caller with intelligible speech to place a telephone call to anyone with a regular telephone. Using CapTel, inmates would place their call and speak directly to the other party. The other party would then speak in response to the inmate. The other party's spoken response would then be converted by a captioning service to on-screen text that the inmate could then read. For late-deafened, educated native speakers of English who possess the literacy skills the use of CapTel would give them an equivalent level of telephonic access as other non-deaf inmates. It is my opinion that to ensure effective communication, Defendants must provide d/Deaf and hard of hearing inmates who have intelligible speech and proficiency in English with CapTel access equivalent to the level of access that is provided to non-deaf inmates have to regular telephones.

For some d/Deaf and hard of hearing inmates, CapTel is not at all a viable option because of their unintelligible speech and extremely limited English proficiency. During the past fifteen years, Deaf people have eagerly and quickly replaced TTYs with VPs for very understandable reasons: first, TTYs require communication in typed English (the second language for most d/Deaf and hard of hearing people and a language in which, as noted above, they rarely attain any significant level of fluency). Second, because TTY conversations are typed, those conversations take significantly longer and thus when d/Deaf or hard of hearing people used TTYs they would keep conversations very brief (*e.g.*, to make arrangements to meet in person). Over the last ten to twelve years, as noted above, d/Deaf and hard of hearing people have quickly abandoned TTYs in favor of VPs because VPs enable d/Deaf and hard of hearing people to communicate using ASL, a language in which they are much more comfortable and fluent. Thus their VP conversations are not encumbered by written English nor slowed by having to type. Signed VP conversations are exactly analogous to spoken telephone conversations.

If each party has a VP then they can communicate directly; however, if only one party has a VP then communication with the party who does not have a VP is only possible using a free VRS, which utilizes the same hardware/software as the VP. Either party can initiate communication by connecting with a VRS provider, and a VRS

interpreter will facilitate the call, communicating via VP with the d/Deaf or hard of hearing caller and via voice with the non-deaf caller. In other words, if a VP user calls someone who does not have a VP, they would use the VP to call a VRS center where a qualified ASL interpreter would answer and translate between them and the non-VP user.

It is my opinion that Defendants must make at least one CapTel phone available to each d/Deaf and hard of hearing inmate who has telephonically intelligible speech and make it possible for them to access point-to-point telephone calls. Further, I believe that Defendants must provide access to VPs and VRS providers in all KDOC facilities so that d/Deaf and hard of hearing inmates will have telephone services and benefits that are relatively equal to those afforded non-deaf inmates.

m) **Defendants have not provided adequate communicative access:**   Given that Defendants do not provide d/Deaf and hard of hearing inmates with appropriate visual alarms/signals, generally have not provided d/Deaf and hard of hearing inmates with the services of qualified interpreters, and generally have not provided d/Deaf and hard of hearing inmates with an equivalent level of telephonic communication enjoyed by other inmates, it is my opinion that Defendants have failed to provide adequate and effective communicative access for d/Deaf and hard of hearing inmates incarcerated by the KDOC. I believe that the following remedies must be put in place in order for KDOC d/Deaf and hard of hearing inmates to have a level of effective communication and a level of communicative access similar to that enjoyed by inmates who are not d/Deaf or hard of hearing:

1) I believe that Defendants must provide training programs to KDOC personnel regarding interactions with d/Deaf and hard of hearing inmates and the services available for them.

2) I believe that Defendants must provide an ADA coordinator at each facility who will receive requests from d/Deaf and hard of hearing inmates for accommodations, rather than requiring inmates to have to go through a grievance procedure.  The ADA coordinator should also provide quarterly analyses of each facility's programs in order to assure ongoing compliance with applicable regulations and continuing access and effective communication for d/Deaf and hard of hearing inmates.

3) I believe that KDOC should provide ASL classes for inmates so that late-deafened and hard of hearing inmates can improve their fluency in the best means of communication that may be available to them.

4) I believe that defendants must provide auxiliary devices, such as strobe lights, shake-awake alarms and message boards, to enable deaf and hard of hearing inmates to have effective communication and equal access to information during emergency situations and during announcements.

5) I believe that Defendants must provide qualified, professional, credentialed interpreters for all group and "high stakes" interactions involving d/Deaf and hard of hearing inmates which clearly include, but are not limited to, disciplinary and investigative meetings and hearings, medical appointments and visits, appointments with psychologists/psychiatrists and/or other mental health professionals, offender treatment and rehabilitative programming, meetings with facility administration, meetings with counselors, classes and/or educational opportunities.  In my opinion, failure to do so means that Defendants cannot accurately state that they are providing d/Deaf and hard of hearing inmates with the "qualified interpreters" needed to permit meaningful and effective communication and access equal to that provided to non-deaf inmates.

6) I believe that Defendants must install VRI units in strategic locations in each facility that houses a d/Deaf or hard of hearing inmate for use during emergency situations (such as emergency medical visits) where it is not possible for Defendants to timely obtain a qualified interpreter. In my opinion, the use of VRI minimally in the medical facilities office and a room in which disciplinary and counseling meetings might occur is necessary to provide effective communicative access for d/Deaf and hard of hearing inmates. Further, it is my opinion that VRI should be used to *supplement*, but definitely not replace regularly scheduled physically present interpreters because there are a number of interpreted interactions that are best handled with a physically present interpreter and/or may occur in physical locations not equipped for VRI.

7) I believe that Defendants must provide those d/Deaf or hard of hearing inmates who have telephonically intelligible speech and are literate in English with access to a

CapTel so that they will have the same level of telephonic access experienced by non-deaf inmates. This will enable those d/Deaf and hard of hearing inmates to place approved calls directly to friends, family, attorneys and other individuals with whom they may wish to have contact.

8) I believe that Defendants must provide d/Deaf or hard of hearing inmates who do not have telephonically intelligible speech or who do not possess sufficient English literacy with access to a VP so that they will have the same level of telephonic access experienced by non-deaf inmates. This will enable these d/Deaf or hard of hearing inmates to place approved calls directly to those who also have a VP or, using the free FCC-funded VRS interpreters, to place calls to friends, family, attorneys and other individuals with whom they may wish to have contact who do not have a VP.

**Opinions with respect to treatment of d/Deaf or hard of hearing inmates in KDOC facilities:**

- The fact that a d/Deaf or hard of hearing person uses his/her speech in certain restricted interactions cannot be taken as an indication that that person does not require the services of an ASL/English interpreter in order to have effective communication.

- The fact that a d/Deaf or hard of hearing person is able to lip-read in certain restricted interactions cannot be taken as an indication that that person does not require the services of an ASL/English interpreter in order to have effective communication.

- Reliance upon verbal commands, announcements and signals is an inefficient and ineffective means of communicating for and with many d/Deaf or hard of hearing inmates.

- Reliance upon announcements made over a PA system to signal all moves and provide other information is not an effective nor efficient way to communicate with d/Deaf and hard of hearing inmates.

- Provision of CapTel functionality is necessary to provide equivalent telephonic services to d/Deaf and hard of hearing inmates who have telephonically intelligible speech and a level of literacy.

- Provision of a VP and access to a VRS is necessary to provide equivalent telephonic services to d/Deaf and hard of hearing inmates unable to use CapTel.

- VRI is the best way to provide d/Deaf and hard of hearing inmates with effective and equivalent access to "an interpreter who is able to interpret

effectively, accurately and impartially both receptively and expressively, using any necessary specialized vocabulary" in high stakes, "emergency" situations.

- VRI equipment in the nurse's office, warden's office and, other key locations in each KDOC facility that houses d/Deaf and hard of hearing inmates, may be the only way for KDOC to provide effective communication in emergency situations.

- Provision of qualified sign language interpreter services is the only way to provide d/Deaf and hard of hearing inmates with access and effective communication for the same educational, training and self-improvement programs available to inmates who are not d/Deaf or hard of hearing.

- VRI should only be used in "last minute/emergency" situations in which an interpreter is needed. VRI and should not be viewed as a replacement for physically present interpreters at most scheduled high stakes and "public" situations.

- A mandatory information, orientation and education program for KDOC personnel who are responsible for, or have need to interact with d/Deaf and hard of hearing inmates is necessary to address any stereotypes and audist biases and to promote the level of understanding of issues and needs of d/Deaf and hard of hearing inmates that will ensure nondiscrimination.

## 7. Summary

Members of the American Deaf Community are a linguistic and cultural minority. The language that binds them together and is the critical determinant for membership in the Community is ASL. The vast majority of people who are not deaf have naïve, stereotypic and audist misconceptions about Deaf people and ASL. They believe that d/Deaf people can lip-read with a degree of accuracy that will enable meaningful communication, when in reality the level of accuracy for most d/Deaf people is 30% at best. Those who are not deaf believe that Deaf people can read and write English fluently when in reality the average Deaf person reads at approximately a fourth grade reading level. Those who are not deaf fail to understand that in order for communication with d/Deaf inmates to be effective and efficient that communication must be visually clear and unambiguous.

Defendants have not installed a sufficient number of visual alarms or signals in its facilities, and many facilities have none. At minimum, Defendants should provide strobe lights, shake-awake alarms and visual displays that would provide d/Deaf and hard of hearing inmates with the same access to information provided to non-deaf inmates by hearing public announcements.

For meaningful, serious, high stakes interactions, communicative access for d/Deaf and hard of hearing inmates must be provided a qualified ASL interpreter. In addition to physically present interpreters, technology has made it possible to use the services of VRS or a VRI for emergency situations where it is not possible to timely obtain the services of a qualified interpreter.

Additionally, Defendants should provide d/Deaf and hard of hearing inmates who have telephonically intelligible speech and a level of literacy with telephone services and benefits equivalent to those afforded non-deaf inmates through the provision of CapTel telephone services. Defendants should also provide all d/Deaf and hard of hearing inmates who do not have telephonically intelligible speech and a level of literacy with telephone services and benefits equivalent to those afforded non-deaf inmates through the provision of a VP and access to VRS.

Based on my forty-six years of experience with the Deaf Community and my review of materials provided to me, I believe that Defendants have denied d/Deaf and hard of hearing inmates access to effective communication. Based on my experience, I believe that d/Deaf and hard of hearing inmates housed in KDOC facilities are the victims of audism.

Lack of information about Deaf people, their language and their culture on the part of KDOC employees appears to play a major factor in their decisions to deny or restrict access for d/Deaf and hard of hearing inmates to programs and services available to non-deaf inmates. One way to address lack of information and ignorance about Deaf people, their language and their culture is to implement awareness-training programs.

Finally, as additional information becomes available, I expect to examine that material and expand upon the opinions offered in this report and respond to the reports of Defendants' expert(s).

Date:  September 16, 2014

_Dennis Cokely_

_____
Dennis Cokely

# References

Alaska Justice Forum 24(2): 2-4. National Assessment of Adult Literacy and Literacy Among Prison Inmates. Justice Center, University of Alaska Anchorage. (Summer 2007).

Baker, Charlotte and Robbin Battison (eds.). 1980. *Sign Language and the Deaf Community: Essays in Honor of William C. Stokoe*. Silver Spring, MD: National Association of the Deaf.

Baker-Shenk, Charlotte and Dennis Cokely. 1980. *American Sign Language: a Teacher's Resource text on Grammar and Culture*. Washington, DC: Gallaudet University Press.

Bernstein, Lynne and Edward Auer, Jr. 2003. "Speech Perception and Spoken Word Recognition." In Marschark and Spencer (eds.) *Deaf Studies, Language, and Education*. New York: Oxford University Press.

Brown, C. M. (1988). Human-computer interface design guidelines. Norwood, NJ: Ablex Publishing.

Charrow, Veda. 1974. Deaf English: An Investigation of the written English Competence of Deaf Adolescents. Unpublished dissertation. Stanford University.

Charrow, Veda. 1975. "A Psycholinguistic Analysis of 'Deaf English'. Sign Language Studies 4:7 p.139-149.

Chernov, Ghelly. 1978. Inference and Anticipation in Simultaneous Interpreting. Philadelphia, PA: John Benjamins.

Cokely Dennis. 2005. "Shifting Positionality: a Critical Examination of the Turning Point in the Relationship of Interpreters and the Deaf Community." In: Marschark, Peterson, and Winston, (eds) *Sign language Interpreting and Interpreter Education: Directions for Research and Practice*. Oxford: Oxford University Press.

Cokely, Dennis. 1992. *Interpretation: A Sociolinguistic Mode of the Interpretation Process*. Burtonsville, MD: Linstok Press

Cokely, Dennis. 2001 "Interpreting Culturally Rich Realities: Research Implications for Successful Interpretation." *Journal of Interpretation*: Millennial Edition 1-46.

Costello, Elaine. 1995 *Signing: How to Speak with Your Hands*. New York, NY: Bantam Books

Crystal, David. 1997. *The Cambridge Encyclopedia of Language*. Cambridge, UK: Cambridge University Press.

deVilliers, P. and S. Pomerantz. 1992. "English Literacy Development in Deaf Children: Directions for Research and Intervention." In J. Miller (ed.) Research on child Language Disorders: A Decade of Progress. Austin, TX: Pro-Ed.

Duranti, Alessandro.1977. *Linguistic Anthropology*. Cambridge, UK: Cambridge University Press.

Frishberg, Nancy. 1986. *Interpreting: An Introduction*. Silver Spring, MD: RID Publications.

Gates, George and John Mills. 2005. "Presbycusis." *The Lancet*: 366(9491), 1111-1120

González R.D., V.F. Vásquez and H. Mikkelson. 1991. *Fundamentals of court Interpretation: Theory, Policy and Practice*. Durham, NC: Academic Press.

Hatim, Basil and Ian Mason. 1997. *The Translator as Communicator*. New York: Routledge.

Jankowski, Katherine. 2002. *Deaf Empowerment: Emergence, Struggle, and Rhetoric*. Washington, DC: Gallaudet University Press.

Janzen, Terry (ed.). 2005. Topics in signed Language Interpreting. Philadelphia, PA: John Benjamins.

Karchmer, Michael A. and Ross E. Mitchell. 2003. "Demographic and Achievement Characteristics of Deaf and Hard-of Hearing Students." In Marschark and Spencer (eds.) *Deaf Studies, Language, and Education*. New York: Oxford University Press.

Klare, G.R. (1974). "Assessing readability." *Reading Research Quarterly*: 10(1), 62-102.

Klare, George R. "Readability." *Handbook of Reading Research*. P. David Pearson, et al. (eds.) New York: Longman, 1984. 681-744.

Klima, Edward and Ursula Bellugi 1979. *The Signs of Language*. Cambridge, MA: Harvard University Press.

Kruger, Justin and David Dunning. 1999. "Unskilled and unaware of it: How Difficulties in Recognizing One's Own Incompetence Lead to Inflated Sel-Assessments. Journal of Personality and Social Psychology. Volume 77 (6) 1121-1134

Lane, Harlan. 1984. *When the Mind Hears: A History of the Deaf*. New York: Random House.

Lane, Harlan. 1992. *Mask of Benevolence: Disabling the Deaf Community*. New York: Knopf.

Lane, Harlan, Richard Pillard and Ulf Hedberg. 2011. *The People of the Eye: Deaf Ethnicity and Ancestry*. New York: Oxford University Press

Larson, Mildred. 1998. *Meaning-Based Translation: a Guide to Cross-Cultural Equivalence*. Lanham, MD: University Press of America.

Liben, Lynn. 1978. *Deaf Children: Developmental Perspectives*. New York: Academic Press.

Lucas, Ceil. 2001. *The Sociolinguistics of the Deaf Community*. Cambridge, UK. Cambridge University Press.

Lyons, John. 1977. *Semantics*. Cambridge, UK: Cambridge University Press.

Lyons, John. 1995. *Linguistic Semantics: An Introduction*. Cambridge, UK: Cambridge University Press.

Marschark, Marc and Patricia Elizabeth Spencer (eds.). 2003. *Deaf Studies, Language, and Education*. New York: Oxford University Press.

Mayberry, Rachel. 2002. "Cognitive development in deaf children: the interface of language and perceptions in neuopsychology." In Segalowitz and Rapin (eds) *Handbook of Neuropsychology*. Elsevier Science B.V.

McIntire, Marina (ed.). 1986. *Interpreting: The Art of Cross-Cultural Mediation*. Silver Spring, MD: RID Publications.

Mindess, Anna. 1999. *Reading Between the Signs: Intercultural Communication for Sign Language Interpreters*. Yarmouth, ME: Intercultural Press.

Moser-Mercer, Barbara. 1978. "Simultaneous Interpretation: A Hypothetical Model and Its Practical Application." In Gerver & Sinaiko (eds.). *Language Interpretation and Communication*. New York: Plenum Press

Padden, Carol and Tom Humphries. 1989. *Deaf in America: Voices from a Culture*. Cambridge, MA: Harvard University Press.

Padden, Carol and Tom Humphries. 2005. *Inside Deaf Culture*. Cambridge, MA: Harvard University Press.

Peterson, Rico. 1999. *The Perceptions of Deafness and Language Learning of Incoming ASL Students*. Unpublished dissertation. University of California, Riverside.

Pöchhacker, Franz. 2004. *Introducing Interpreting Studies*. London: Routledge.

Registry of Interpreters for the Deaf. 2007. Interpreting in Legal Settings

Richards, I. 1953. "Towards a Theory of translating" *American Anthropological Association, Studies in Chinese Thought 55 (Memoir 75)*: 247-262.

Robinson, Douglas. 1997. *Becoming a Translator*. New York: Routledge.

Rutherford, Susan. 1992. A Study of American Deaf Folklore. Burtonsville, MD: Linstok Press.

Seleskovitch, Danica. 1978. *Interpreting for International Conferences*. Washington, DC: Pen and Booth.

Schein, Jerome. 1996. "The Demography of Deafness" in Higgins and Nash (eds) *Understanding Deafness Socially*. Springfield, IL: Charles C. Thomas,

Spingarn, Tracie. 2001 "Knowledge of Deaf Community-Related Words, Symbols and Acronyms among Hearing People: Implications for the Production of an Equivalent Interpretation. *Journal of Interpretation*: Millennial Edition 69-84.

Stewart, Davis, Jerome Schein and Brenda Cartwright. 1998. *Sign Language Interpreting: Exploring Its Art and Science*. Needham Heights, MA: Allyn Bacon.

Stokoe, William, Dorothy Casterline and Carl Croneberg. 1965. *A Dictionary of American Sign Language on Linguistic Principles*. Washington, DC: Gallaudet University Press.

Valli, Clayton, Ceil Lucas and Kristin Mulrooney. 2005. *Linguistics of American Sign Language*. Washington, DC: Gallaudet University Press.

Wadensjö, Cecilia. 1998. *Interpreting as Interaction*. New York. Addison Wesley Longman.

Weaver, Gary. 1997. Culture, Communication and Conflict: Readings in Intercultural Relations. Boston, MA: Pearson Publishing.

Woodward, James C. 1972. "Implications for Sociolinguistic Research among the Deaf." *Sign Language Studies* 1:1-7.

Woodward, James. 1978. "Historical Bases of American Sign Language." In P. Siple (ed) *Understanding Language Through Sign Language Research*. New York: Academic Press.

Woodward, James C. 1994. Describing Variation in American Sign Language: Implicational Lects on the Deaf Diglossic Continuum. Silver Spring, MD: Linstok Press.

Wrigley, Owen. 1996. *The Politics of Deafness*. Washington, DC: Gallaudet University Press.

**Websites Cited**

Video Analysis Software
> http://www.bu.edu/asllrp/SignStream/
> http://www.sstudiocodegroup.com/

National Consortium of Interpreter Education Centers
> http://www.interpretereducation.org/wp-content/uploads/2013/02/Practitioner_FINAL_REPORT_021513.pdf

Registry of Interpreters for the Deaf
> http://www.rid.org

Americans with Disabilities Act Technical Assistance Manual
> http://www.ada.gov/taman3.htm