# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF KENTUCKY
### AT FRANKFORT

| | |
|---|---|
| **OSCAR ADAMS and MICHAEL KNIGHTS** | |
| **Plaintiffs** | |
| v. | Case No. 3:14-cv-00001-GFVT |
| **COMMONWEALTH OF KENTUCKY, et al.** | |
| **Defendants.** | |

## Ninth Semi-Annual Report by the Settlement Monitor
### December 16, 2020

Margo Schlanger
Settlement Monitor
625 So. State Street
Ann Arbor, MI 48109

1

## I.    INTRODUCTION

The Settlement Agreement in this matter became effective on June 29, 2015, and was originally set to remain in effect for five years from that effective date. I filed my most recent prior report in May 2019, six months ago. It acknowledged the real effort and attention undertaken by KDOC headquarters and institution staff, but expressed concern that substantial compliance had not yet been achieved.

Responsive to that concern, the parties agreed to an extension of the settlement term to the end of 2020. See *Amendment to the Settlement Agreement between Defendants the Commonwealth of Kentucky and Plaintiffs Oscar Adams and Michael Knights*, ECF #98-1 (Aug. 3, 2020).  That document also provided, "The KDOC, however, intends, but is not bound by this Agreement, to provide all accommodations required under the law, including under the U.S. Constitution, the ADA, Section 504 of the Rehabilitation Act, and Kentucky laws, along with any other applicable federal and state laws, after this Agreement expires."

In this current filing, although the COVID pandemic has created real obstacles, I am pleased to report yet more progress. I cannot say that each KDOC prison is complying with each and every settlement agreement provision. However, compliance with many of the ADA/Settlement Agreement requirements has been accomplished. And I believe there is now a system in place that can—if the prison authorities so choose—succeed in maintaining that compliance and in solving remaining problems. In order to assist in that process, I continue to offer recommendations for the period after the settlement term closes.

This report is based on several sources of information:

- The self-audit process I have described in prior reports, with most information provided as of October 1, 2020. I shared the most current self-audit checklist with each KDOC ADA Coordinator and Warden on September 15, 2020, along with a request for other information. (The memo I sent is attached as Exhibit 1.) I asked that each institution complete and return it to me two weeks later. The resulting spreadsheet and, where they seem useful, other responses are attached as Exhibit 2. (I have redacted inmate names and id numbers.)  I did several additional information requests, dated September 22, October 1, and November 21.  All are attached, redacted, in Exhibit 1.  I also circulated this report in draft on December 8, and received some additional information by December 14. This is described in Part II.2, below.
- Followups with institutions and KDOC headquarters about the areas of concern identified in the last report, and with KDOC's medical contractor, Wellpath, about ongoing audiology processing.
- Over 150 inmate telephone interviews, and other inmate communications via letter and J-Pay, a form of email.
- Telecommunications testing of TTYs and captioned telephones.

As usual, Table 1, below, tallies deaf/HOH inmates at each institution. The numbers presented are based primarily on the information received in October 2020; locations are as of November

2020. However, the count of deaf/HOH inmates listed at each institution is not simply the self-reported figure; instead, I supplemented the self-reporting using a master list of deaf/HOH inmates that I maintain based on all the institutions' prior reporting, and then updated locations using KDOC's online inmate lookup page. The result addws dozens of inmates to this cycle's self reporting. (I provided the list of added individuals to KDOC.) There is some remaining confusion around identification/tracking of individuals—I discuss this below at Part II.2.

**Table 1: KDOC Institutions**

| Institution | # HOH Inmates Apr. 2019 master list, locations as of Sept. 2019 | # HOH Inmates March 2020 | # HOH Inmates October 2020 |
|---|---|---|---|
| Blackburn Corr. Complex (BCC) | 12 (0 deaf) | 26 (0 deaf) | 26 (0 deaf) |
| Bell County Forestry Camp (BCFC) | 3 (0 deaf) | 6 (0 deaf) | 8 (0 deaf) |
| Eastern Ky. Corr. Complex (EKCC) | 59 (0 deaf) | 94 (0 deaf) | 138 (0 deaf) |
| Green River Corr. Complex (GRCC) | 49 (0 deaf) | 63 (1 deaf) | 91 (1 deaf) |
| Ky. Corr. Inst. For Women (KCIW) | 17 (2 deaf) | 32 (2 deaf) | 61 (2 deaf) |
| Ky. State Penitentiary (KSP) | 32 (1 deaf) | 69 (1 deaf) | 109 (1 deaf) |
| Ky. State Reformatory (KSR) | 217 (2 deaf) | 283 (1 deaf) | 327 (1 deaf) |
| Lee Adjustment Center (LAC) | 32 (0 deaf) | 42 (0 deaf) | 45 (0 deaf) |
| Luther Luckett Corr. Complex (LLCC) | 155 (2 deaf) | 211 (1 deaf) | 232 (1 deaf) |
| Little Sandy Corr. Complex (LSCC) | 92 (1 deaf) | 148 (1 deaf) | 165 (1 deaf) |
| Northpoint Training Center (NTC) | 76 (1 deaf) | 94 (1 deaf) | 150 (1 deaf) |
| Roederer Corr. Complex (RCC) | 26 (0 deaf) | 86 (0 deaf) | 111 (0 deaf) |
| Western Ky. Corr. Complex/Ross-Cash (WKCC) | 55 (0 deaf) | 52 (0 deaf) | 68 (0 deaf) |
| **TOTAL** | **825 (9 deaf)** | **1206 (8 deaf)** | **1531 (8 deaf)** |

In my prior report, I raised the issue whether the Settlement Agreement covers state inmates housed in county jails, which had become more salient because of a lawsuit filed by a hard-of-hearing inmate.  See Hicks v. Williams, 5:20-cv-00081-TBR (W.D. Ky.). Complaining that he has been unable to get access to parole-required programming because of his hearing impairment, Mr. Hicks seeks to be moved from the Fulton County Jail to a jail or prison that complies with the Settlement Agreement in this case. I asked both plaintiffs' and defendants' counsel to share their thoughts about his case's appropriate connection to this litigation; both sides agreed that this case was not intended to reach Kentucky's jails, even for state inmates housed there. Mr. Hicks case remains open. In light of the parties' shared understanding about the scope of the instant case, and the fact that it is nearing its conclusion, I do not discuss jail issues further.

In what follows, in Part II, I begin with systemwide issues previously discussed. In this report, I repeat the prior identified action items in **bold text**, followed by a summary of the progress on each. My resulting recommendations for the period of time that follows this report—including after the close of the settlement agreement period—are in ***bold italic***. (For ease of reference, I also repeat these new recommendations, numbered, in the Conclusion.)

In Part III, I list additional issues that emerged with high frequency from the many interviews my assistants conducted, and make relevant recommendations for the period following the close of the settlement term.  (These, too, are repeated in the Conclusion.)

In Part IV, I move to statistics relating to audiology processing times. These are much improved. Part V lists a few institution-specific issues that seem important enough to memorialize and discuss. Part VI is the Conclusion.

## II.    PRIOR-IDENTIFIED SYSTEMWIDE ISSUES

### 1.  New ADA Coordinators

**Prior recommendation: KDOC should develop and implement an ADA Coordinator transition process, which should include processes for at least the following:**

- **informing new ADA Coordinators about available resources,**
- **linking them to other facilities' ADA Coordinators,**
- **walking them through auxiliary aid, reporting, and tracking processes,**
- **updating the recipients of ADA related emails (for example, automated transfer emails),**
- **updating the KDOC website list of ADA Coordinators.**

Progress: KDOC is now compliant with this recommendation. It seems that compliance extends even to its privately run institution, and is underway, as well, for a new institution scheduled to come on-line soon.

In October 2020, I conducted a (remote) 2-hour ADA and compliance training to ADA Coordinators and Wardens, via Zoom.  Training slides and a video of the session were provided to KDOC for any future personnel. The slides are attached as Exhibit 3.

### 2.  Inmate tracking, transfer alerts, etc.

**Prior recommendation: Someone at KDOC headquarters should check <u>each and every</u> inmate for whom there is a record of a hearing impairment, and ensure that each of them is being appropriately tracked in KOMS.**

**Individuals whose records have only a general alert, in Kentucky Offender Management System (KOMS) need an ADA alert. The transfer notification system needs to be tested and problems solved, from KDOC headquarters.**

**Whether the information comes automatically to medical or is relayed by the ADA Coordinator, medical staff responsible for intake should be informed that a deaf/HOH inmate is incoming, so that they can ensure that audiology processes are not interrupted, deal with lost hearing aids, etc.**

Progress: I previously noted that after some transitional difficulties all the prisons—including the private facility, Lee Adjustment Center—were getting transfer notices. New integration of medical records and KOMS has improved the system by which new identifications are flagged. The new system will automatically insert an ADA alert into an inmate's KOMS record whenever a medical provider confirms a diagnosis of a hearing impairment. (The system currently requires several steps for this to occur, but is being streamlined in the next several weeks.)  Once some technical glitches are fixed, the new system will also send each ADA Coordinator a notice that there's been a new diagnosis entered for an inmate at his/her prison, so that the ADA Coordinator can then provide further details in the ADA tab's notes space. As the ADA Coordinators themselves confirmed (see prior report) it would be best for that space to record accommodations/auxiliary aids needed (and date issued); degree of hearing impairment; and communications method of choice. I do not know whether the ADA Coordinators have gone through their inmate lists and entered this information for all of the inmates.

***I recommend completion of the planned KOMS improvements.  In addition, once the ADA flag is triggered by a medical diagnosis, I recommend that medical staff review the appropriate information for each one and place their diagnoses into KOMS.***

Notwithstanding these technical improvements, as of early December, there were a significant number of inmates—over 200—for whom some confusion remained. For over 100 inmates this reporting period, I received audiology-processing information but not auxiliary aid information, and for another several dozen I received auxiliary aid information but have never received audiology information. In addition, I had compiled a list of a few dozen more current inmates who were previously reported to me as Deaf/HOH, but whom no institution flagged in this reporting period. Last week, I provided a list of the problematic names and ID#s to KDOC, and asked that they investigate and report back promptly. For some of the inmates included in this exercise, investigation indicated that they were not Deaf/HOH, after all—some had subsequent medical testing that demonstrated no hearing impairment; others had a non-hearing disability. For others, the issue was that the last day covered by the two reports was not the same. But for quite a few, investigation revealed that the absence of an ADA flag was an oversight. And review of audiology records demonstrated that at some institutions, only hearing impairments classified as "significant" were leading to a hard-of-hearing diagnosis and the corresponding ADA flag. This was incorrect: even a moderate impairment should be recorded and tracked—and if necessary accommodated—once detected.

Wellpath's speciality clinic coordinator reviewed this issue and informed me that a solution was underway:

> I will be emailing my spreadsheet to all providers today so that they can verify that each of their HOH patients including "active", "does not qualify" "refused", and "released" have the correct diagnosis, precaution, and ADA alerts in their chart. I will also be checking any future HOH patient charts to ensure all the correct documentation is included moving forward. I also verified that diagnosis should be entered for any level of hearing loss even if they do not qualify for an Hearing aid.

5

This remedial plan seems very appropriate. To memorialize it in a recommendation, ***now that ADA identification issues are sorted out, I recommend that KDOC and Wellpath conduct records both retrospective and prospective review to ensure correct documentation and diagnosis flags.***

*3.   Audiology standards*

**Prior recommendation: Providers at each institution should receive a new memo with the correct audiology standard, and the update should be emphasized in some kind of training or other communications.**

**Providers at each institution should be trained about how to evaluate the need for binaural hearing aids, and should review recent requests for two hearing aids and evaluate them against the policy, with oversight from the regional medical director. In addition, inmates who have hearing deficits in both ears should have the policy explained to them when they are denied binaural amplification, so that they can make an informed decision whether to grieve the denial.**

Progress: At this point, I am satisfied that providers have been appropriately informed about the binaural amplification policy. I continue to have some substantive concern about whether binaural amplification is being provided when appropriate, but I do not feel that either my role or expertise allows me to countermand the recent denials of binaural amplification. ***I recommend that KDOC make periodic efforts to remind medical providers that while binaural amplification is not to be provided routinely, it is appropriate where there is a safety or vocational need for it. In addition, it would be a good practice for medical grievances raising binaural amplification to be evaluated by a different physician, to bring a fresh perspective to the request.***

*4.   Audiology services delays*

**a. Prior recommendation: KDOC's medical provider should centralize a reporting system so that if any inmate has not completed audiology processing in three months—from the first report of a hearing problem to provision of a hearing aid or other resolution—that is reported centrally and headquarters staff take a role in immediately solving the problem.**

Progress: Wellpath, KDOC's medical contractor, has now designated a "specialty clinic coordinator" to track and manage audiology progress. The COVID-19 pandemic has caused some delays (see Part IV, below), but it does seem that a system is now in place to monitor and solve problems.

**b. Prior recommendation: There needs to be an instruction to *both* the transferring and the new institution; the transferring institution should send a progress note for all inmates whose audiology evaluation/provision is in-process, and the new institution should do a thorough chart review for each inmate who might be HOH, to check for in-process audiology needs.**

Progress: The automated ADA alert in KOMS should help with this problem; if an inmate is flagged in KOMS, the ADA Coordinator and health staff will know about it and be able to look for pending audiology issues.  The new "treatment team" approach, combined with case management by Wellpath, can then solve any delays. That said, since the KOMS flag itself does not take place until diagnostic confirmation by a provider, it is still possible for individuals to be accidentally dropped if they are transferred prior to such confirmation. Before the last report, KDOC shared with me a new "Workflow for Auxiliary Aid upon transfer," which included chart review completed by the institutional Provider "to determine if a patient is being worked up as HOH." In addition, it seems that Wellpath's specialty clinic coordinator is tracking people prior to diagnosis.  So it seems plausible that this problem has been solved.  That said, ***I recommend that the specialty clinic coordinator conduct spot checking to ensure that her tracking list includes all inmates who are undergoing audiology workup, including prediagnosis, and solve any problems that emerge.***

### 5.   Auxiliary aids

**a. Devices**

Table 2 itemizes auxiliary aids I'm aware each institution has, based on their reporting.

**Table 2: Auxiliary Aids Available.**

| | BCC | BCFC | EKCC | GRCC | KCIW | KSP | KSR | LAC | LLCC | LSCC | NTC | RCC | WKCC/Ross |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Telecommunication devices/amplification** | | | | | | | | | | | | | |
| Captioned telephone* | Y | Y | Y | Y | Y | Y | Y | IP | Y | Y | Y | Y | Y |
| Portable phone amplifiers* | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y |
| TTY | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y |
| Videophone kiosk* | | | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y |
| **Non-telecommunication amplification** | | | | | | | | | | | | | |
| Assistive listening (FM radio transmitters)* | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y |
| Earphones for orientation video* | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y |
| Earphones for parole hearings* | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y |
| **Non-auditory alerts** | | | | | | | | | | | | | |
| ADA support inmates | Y | Y | Y | Y | | | Y | Y | Y | Y | Y | Y | Y |
| Bed shakers | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | |
| Lights flash for count etc.** | Y | Y | Y (HOH walks) | Y | | | | | | Y | | | Y |
| Pagers | | Y | | | | Y | Y | | | | | | |
| Vibrating watches* | Y | Y | Y | Y | | Y | Y | Y | Y | Y | Y | Y | Y |
| Vibrating alarm clocks* | Y | Y | Bed shaker is alarm clock | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y |
| **Interpretation** | | | | | | | | | | | | | |
| VRI/VRS laptop* | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y | Y |

IP = In Progress  * = Recommended for every facility ** = Recommended wherever practicable

Of course, it is not enough to have auxiliary aids available—they need to be used, not set on a shelf. Table 3 demonstrates that KDOC's institutions are quite uneven in their usage rate of various auxiliary aids. For the institutions where usage is very low, it is likely that better education or access rules would increase the usefulness of these new accommodations.

**Table 3: Auxiliary Aids Issuance Rate**

| Institution | # HOH inmates (October 2020) | Auxiliary Aids Issued | | | | |
|---|---|---|---|---|---|---|
| | | Vibrating clocks/ watches | Bed-shakers | Behind-head masks | Clear masks (issued to staff) | Captioned telephone access |
| BCC | 26 (0 deaf) | 0 | 5 | 2 | 0 | All |
| BCFC | 8 (0 deaf) | 0 | 0 | 1 | 0 | 8 |
| EKCC | 138 (0 deaf) | 22 | 0 | 7 | 0 | 25 |
| GRCC | 91 (1 deaf) | 14 | 6 | 25 | 6 | All |
| KCIW | 61 (2 deaf) | 8 | 4 | All | 0* | All |
| KSP | 109 (1 deaf) | 1 | 1 | 114 | 10 | 8 |
| KSR | 327 (1 deaf) | 86 | 45 | 159 | 187 | 2 |
| LAC | 45 (0 deaf) | 18 | 7 | 1 | 3 | No captel |
| LLCC | 232 (1 deaf) | 113 | 2 | All | 1 | 2 |
| LSCC | 165 (1 deaf) | 52 | 3 | 106 | 7 | 11 |
| NTC | 150 (1 deaf) | 13 | 3 | 15 | 120 | 8 |
| RCC | 111 (0 deaf) | 28 | 2 | 61 | 0 | 8 |
| WKCC (incl. Ross/Cash) | 68 (0 deaf) | 47 | 0 | 37 | 12 | 2 |
| TOTAL | 1531 (8 deaf) | 402 | 78 | 824 | 346 | 229 |

* Staff remove masks and maintain social distancing when speaking with two inmates who lip read for communication

*i. Videophones:*

**Prior recommendation: KDOC headquarters needs to solve the Purple videophone outage problem so that outages are both rare and brief, or make a systemwide switch to a more reliable videophone provider.**

Progress: Inmates who use the videophones have for several years reported connectivity issues—glitchy or poor connections and pixilation making use difficult (recall, these are videophones; if the user cannot see the image, that's like not being able to hear on a regular phone). Prior to my May 2020 report, KDOC disagreed with these inmate accounts, and stated that no systemic problems existed. In that report, I urged the Department to evaluate further, and more deeply. I am not aware that this occurred.

In the most recent information request, I asked each institution how many out-of-service days its videophone experienced. I think the question was a little bit unclear in the reporting instrument, and so I only received partial responses. That said, two institutions reported issues: EKCC reported that the videophone is typically out-of-service one to two days per month, and LSCC reported an outage period of 30 days, before it received a new videophone. In addition, an inmate at NTC who uses the videophone reports that the camera frequently turns off in the middle of his calls.

*I recommend that, going forward, KDOC headquarters closely monitor outage periods and other technical difficulties and consider alternative vendors or other solutions.*

In addition, access issues still occasionally arise, particularly on evenings and weekends, where Deaf inmates are refused access to the videophone during some of the hours that hearing inmates have access to regular telephones. *The ADA Coordinators should periodically remind staff that access to the videophone, TTY, and captioned telephones should be afforded inmates during the same periods for which hearing inmates can access regular telephones.*

**Prior recommendation: Each institution in which the videophone is widely visible to other inmates should install such a curtain unless there is a significant security obstacle.**

Progress: It was reported to me that the ADA Coordinator at each institution reviewed this situation and solved it where applicable. I have not heard further complaints.

*ii. Portable phone amplifiers:*

**Prior recommendation: Portable phone amplifiers should be available at each institution.**

Progress: Compliant as to purchase; there remain some information and access issues which should be monitored. *Hard-of-hearing inmates should be informed that the amplifiers exist, and the process for using them should be made easy.*

*iii. Phone volume control.*

**Prior recommendation: There should be at least one volume-control phone in every grouping of phones in every institution, including the phones used in restrictive housing.**

Progress:  Compliant.  That said, hard-of-hearing inmates continue to report access difficulties, because these phones are popular for all inmates. *It would be appropriate to add additional volume-control phones wherever practicable.*

*iv. Captioned telephones (or "captels").*

**Prior recommendation: Captioned telephones should be made available in every institution, available at the same hours as a regular phone.**

Progress: At this point, all the facilities except the Lee Adjustment Center have captioned telephones. Installation and use has been challenging, but testing suggests that they all, finally, work. However, ongoing testing remains essential; phones that work this month can stop working for a variety of reasons.  *I strongly recommend that headquarters test both the TTYs and captioned telephones at least twice each year, to ensure that they all stay operational.*

In addition, as Table 3 tallies, some institutions have authorized only a very small number of inmates to use the captioned telephone.  It seems implausible that these institutions don't have

10

any inmate for whom this technology would help meet the ADA obligation of equal access to telephone services.  Access should be offered when needed.

*v. Amplified phones.*

**Prior recommendation: None of KDOC's institutions has an amplified phone, but these too would be worth looking into, centrally.**

Progress: KDOC determined that additional amplified phones were not needed. ***Captioned telephones have amplification features, so ADA Coordinators should inform hard-of-hearing inmates that these are available to them.***

*vi. TTYs.*

**Prior recommendation: Each institution needs to work out and test a protocol by which TTYs can be used—and then write that protocol into full instructions capable of being followed by someone who has never used a TTY before.**

Progress: After my prior report, testing demonstrated that there were many problems with TTY usability and access. After months of effort, all the TTYs are finally operational, and their instructions seem adequate.  But the testing experience over the settlement agreement period demonstrates that this situation is—always—temporary. ***I recommend that headquarters staff obtain access to an online TTY (via http://www.nextalk.com/) and then conduct at least twice yearly TTY-to-TTY and TTY-to-voice testing of each institution's TTY.***

*viii. Assistive listening systems.*

**Prior recommendation: At every institution, assistive listening devices should be made readily available for such environments: religious, educational, and rehabilitative programming. The need is particularly urgent for Substance Abuse Programming, which many institutions conduct in extremely noisy and difficult locations.**

Progress: Each facility now has FM transmitter devices to use for assistive listening. As previously reported, in some, these are going largely unused; in others, they seem to be quite successful.  Which is which seems to depend mostly on whether staff—and particularly the ADA Coordinator—demonstrates their usage to inmates who might benefit. ***I recommend that the ADA Coordinators for the institutions where the transmitter devices are being used successfully in classes and the like share with their colleagues that practices that are producing those successes.***

*ix: Earphones for video communication.*

**Prior recommendation: KDOC should ensure that earphones for video communication are available in each prison, and also anywhere parole hearings are held—that is, in county jails. In addition, individuals who might need this equipment should be informed that it is available.**

Progress: KDOC now reports that earphones are available in each prison. In addition, Kentucky's Parole Board Chair reports that there have been no problems providing accommodations to Deaf/HOH inmates. (I do not have any information either confirming or contradicting this latter report.) Before my May report, KDOC stated that it was planning to propose new standard language governing Parole accommodations at the next meeting of the Commission on Corrections:

> If the Parole Board is conducting a hearing where the offender has a hearing deficit, the Parole Board would not proceed without appropriate accommodations. The Parole Board would advise KDOC that services would need to be arranged for the offender to accommodate his/her hearing deficit. The arrangements would be made by DOC and the Board would proceed after verification that appropriate services are in place.

**_The proposed standards language should be adopted._**

*x. Non-auditory alerts.*

**Prior recommendation: In any housing unit where it is practicable, KDOC should direct staff to flash the overhead lights to signal chow and pill-call. In addition, KDOC should direct implementation of some kind of personal notification to deaf/HOH inmates, so that they do not miss personal announcements (e.g., "John Smith, report to the Unit Administrator").**

Progress: KDOC previously explained that flashing overhead lights is not always practicable. Each facility now reports that it has some kind of system for alerting Deaf/HOH inmates of announcements.  Nonetheless, unequal access to alerts—alerts signally various routine moments every day (count, chow, pill-call, yard), and alerts for personal announcements—remains a major source of difficulty for deaf/HOH inmates. Accordingly, **_I continue to recommend that at every prison, (1) flashing lights be used for routine alerts where practicable, (2) Deaf/HOH (not just Deaf) inmates be provided a method by which they can obtain non-auditory alarm watches or clocks, and (3) in-person notifications be provided where needed for personal alerts, whether by staff or other inmates. This issue will require additional fine-tuning, training, and monitoring._**

**b. Inmate purchases of non-auditory alarm devices**.

**Prior recommendation: KDOC headquarters should check with the institutions that have already piloted the devices about models and methods, and then should make them available for purchase by deaf/HOH inmates at all the institutions. (When inmates transfer from one institution to another, they should be authorized to bring these devices with them.)**

Progress:  Substantial progress towards compliance. All the KDOC institutions now allow inmates to purchase non-auditory alert devices. It is important that these also be made available to indigent inmates. At BCC, for example, the policy that has been adopted and communicated to

inmates is: "The ADA Coordinator will loan non-auditory watches/alarm clocks to indigent individuals. If you are not indigent but are unable to pay for such devices, they are still available to you by loan via an inmate account lien, when sufficient money comes into your account the lien will be satisfied."

I do, however, have some concerns that in some of the institutions, the availability of non-auditory items has not been sufficiently communicated to inmates, or perhaps there's been a breakdown in the purchase system.  As Table 3 sets out, usage is extremely low at some institutions.  Perhaps inmate preferences are different in those institutions—but my educated guess is, some other implementation issue is dampening access to these useful devices.  *ADA Coordinators should continue to communicate to inmates that they have access to non-auditory alarms that can help alert them to various scheduled events in the prison.*

**c. Bulletin boards**.

**Prior recommendation: Bulletin boards posting non-routine announcements should be provided in every housing area at each institution.**

Progress: KDOC agreed to use bulletin boards and other methods, but explained that bulletin boards are not always appropriate. *I continue to recommend that non-routine announcements be communicated in some non-auditory fashion; if bulletin boards are not a workable solution, some other solution is needed, in each housing unit.*

**d. Auxiliary aid processes**.

**Prior recommendation: KDOC should direct all institutions to implement auxiliary aid evaluations/reviews, and the process should have the following characteristics**:

- **An auxiliary aid evaluation should be conducted within 2 weeks—and ideally substantially sooner—of each deaf/HOH inmate's arrival at an institution or identification as deaf/HOH.**
- **The evaluation/process should be performed at a meeting between the inmate and the ADA Coordinator, so that the inmate learns who the ADA Coordinator is, and so that the inmate is given appropriate information about resources and services.**
- **Effective communication should be provided at the meeting—meaning that an interpreter is necessary for any inmate who signs to communicate, and that for inmates who do not read, any documents should be fully explained using accessible language.**
- **At the meeting, the inmate should be informed about all services/resources available—hearing aids, telephonic assistance, interpretation, captioning, etc. The brochure that has been developed for this should be kept on hand, and distributed at the meeting. It should be updated whenever necessary, as new devices or new procedures come online.**
- **Inmates should receive easy-to-provide resources no later than the meeting. For example, that is when they can get bed cards, hard-of-hearing IDs, etc. Criteria**

13

and a clear process should be developed for access to any limited resources (bed shakers, telephone amplifiers, etc.), and explained to the inmates.
- Inmates should be informed at the meeting about a clear process for getting any additional auxiliary aids/assistance they need.

Progress: KDOC reports that the auxiliary aid process has been folded into a "Treatment Team" process. *The key is for auxiliary aid meetings to be held in person with each inmate and for non-medical staff to affirmatively inform inmates of the available devices and services.*

## 6. Inmate handbook

**Prior recommendation: KDOC should standardize a notice for the Inmate Handbook, using text along the lines of what follows**:

{Institution} is required to comply with the Americans with Disabilities Act (ADA). A disability is a physical or mental impairment that substantially limits a major life activity such as seeing, hearing, walking, bathing or breathing. (Temporary conditions, like a broken leg, are not considered a disability.) Under the Americans with Disabilities Act, {Institution} will ensure that inmates with disabilities have access to all services, privileges, facilities, advantages, and accommodations that is substantially equivalent to access provided similarly situated non-disabled inmates.

{Institution} will communicate effectively with inmates who are deaf and/or blind, ensuring that they can receive information from and provide information to staff. When needed for effective communication, {Institution} will provide "auxiliary aids and services." This means devices or services that assist in communication, such as interpretation, hearing aids, captioning, videophones, amplifiers, etc. HOWEVER, if something a disabled inmate seeks—a particular job, for example— would be dangerous, posing a direct threat of injury or death to the inmate or others, {Institution} can bar the inmate's access to that job after individualized consideration and consultation with appropriate medical experts.

{Institution} has an assigned ADA Coordinator who is responsible for training and advising staff in ADA matters and monitoring ADA concerns such as accessibility requirements and accommodations. The ADA Coordinator also reviews requests for adaptive equipment and accommodations as well as ADA complaints. To contact the ADA Coordinator, you may {HOW TO GET IN TOUCH} {e.g., send written correspondence via Institutional Mail or, in the event you are unable to submit a written request, you may contact your Classification and Treatment Officer who shall document and forward your request.}

There is a federal court Settlement Agreement that governs services for deaf and hard-of-hearing inmates. It is available, along with additional information about such services, for all inmates to read on request, in the Inmate Legal Library.

Progress: Compliant.

**III. ISSUES RAISED REPEATEDLY BY INMATES DURING THIS REPORTING PERIOD**

To substitute for site visits (which were not practicable given the pandemic), between August and November, my law-student assistants conducted over 150 phone/videophone interviews of KDOC Deaf/HOH inmates—at least 10 at each prison.  In addition, for each inmate my assistants or I had not previously communicated with, I sent a J-Pay, explaining my role and asking about their experience.  The most common complaints, across institutions, were:

1. Dozens of inmates reported difficulty hearing announcements, both inside and on the yard, leading to missing meals, mail call, pill call, and the like, and causing conflict and threats of disciplinary action. This is addressed above in Part II.5.a.x and II.5.b.

2. Masks are making it harder to read lips and understand staff, and masks that loop behind the wearer's ears physically interfering with behind-ear hearing aids.

   In response to this complaint, I urged KDOC to issue clear masks to staff who frequently encounter inmates who read lips as part of their communication strategy, and to issue behind-the-head masks to inmates who wear hearing aids.  Responses have varied. While each institution reports that both types of masks are now available to staff/inmates, the actual issuance/usage rate varies greatly. (See Table 3.) WKCC's response seems to me useful for all the institutions to learn from; its ADA Coordinator reported that he interviewed 12 inmates with hearing aids, each of whom told him that the ear-loop masks were posing difficulties. Accordingly, WKCC issued tie-back masks to all 37 inmates with hearing aids.

   ***Recommendation: Clear masks and masks that attach behind the wearer's head, rather than behind the ears, are essential. Both are reportedly available at all KDOC institutions, but at some institutions seem to be in use only rarely. Inmates who are Deaf/HOH should be affirmatively asked if their comprehension would be assisted by clear masks for staff in their housing units, work-places, programs, etc., and if they answer yes, those masks should be issued/used accordingly. In addition, staff who will deal with Dear/HOH inmates more generally—the ADA Coordinator, Unit Administrators, etc., should be issued clear masks for use when appropriate. All inmates who wear hearing aids should be affirmatively offered behind-head masks.***

3. Telephones are difficult to use because of background noise. Telephone voice identification difficult for HOH people to use. Insufficient number of volume-adjustable and HOH phones.

   KDOC staff have confirmed that the voice identification and background noise complaints are often well-founded.  ***Recommendation: ADA Coordinators should review phone issues, and ensure that (a) there are enough volume-adjustable and HOH phones for usage patterns, (b) phones are in a space quiet enough to allow HOH individuals to use them, (c) any voice-recognition issues are solved.***

4. Inmates not getting HOH ids, bed signs, other auxiliary aids; not being informed about available auxiliary aids. (E.g., not knowing they could purchase vibrating clock or watch). After ADA Coordinators met with these individuals in response to my questions, a fair number of these inmates needed additional auxiliary aids.

   *Recommendation: These complaints suggest a need to conduct auxiliary aid meetings not just once on an inmate's arrival to a prison, but every year or two.*

5. Many inmates raised hearing aid issues: They report that their hearing aids are not working well, not replaced promptly.  They are unhappy with bilateral hearing aid denials. They report confiscation and then loss of hearing aids on assignment to restrictive housing. And they report great difficulty getting hearing aid batteries—particularly in segregation, but elsewhere as well. One inmate reported that due to an unrelated medical issue, he lacks the manual dexterity to use his hearing aid—his prison's ADA Coordinator responded to me that there is only one kind of hearing aid available, so if he is unable to use it, there is nothing that can be done. Obviously, this is unacceptable—medical staff need to evaluate his situation and assess whether a different device would be accessible to him.

   *Recommendation: The loss of hearing aids on transfer within and between prisons is a longstanding and demonstrated problem. The solution is additional staff training/alertness, and property checklists that include hearing-related equipment. The battery issue has become more prevalent during the pandemic; I recommend that Wellpath review battery availability, prison by prison, and ensure a sufficient stock to avoid shortages. In addition, KDOC/Wellpath should ensure that inmates receive hearing aids medically suited to their situation.*

6. Many inmates complain of disrespect and rudeness from officers, and that they have been threatened with discipline, or even received discipline, for conduct caused by their inability to hear (missing pill call and the like). On investigation, I found several disciplinary records that suggested that an inmate may have been punished for being unable to hear—or, at least, that the staff effort to avoid this unfair consequence was inadequately documented.

   *Recommendation: Staff responsible for disciplinary adjudication should be trained that it is inappropriate to penalize someone for their disability (e.g., for failing to obey an order they did not hear), and that they should ask appropriate questions and document their thought processes with respect to this issue in relevant disciplinary cases. Each ADA Coordinator should conduct such training immediately for appropriate staff, and then repeat it as necessary when new employees assume the disciplinary adjudication role.*

## IV. AUDIOLOGY PROCESSING

Including all the information I have received since the settlement was entered about hearing aid provision and audiology processing, over the settlement term, KDOC institutions have conducted screening examinations of thousands of inmates for hearing impairments, and have provided over 1400 hearing aids.  As in the May 2020 report, I focus below on the individuals who received hearing aids. This is the slowest group, in terms of processing time, so if these inmates are receiving timely services, that is very good news.

Processing timeliness has shown major improvements. My recommendation, made in December 2016, was for a two-month or less turn-around. This has not quite been achieved, but it's now very close. As Table 4 shows, for inmates whose hearing needs came to KDOC's attention in 2019, and who ended up getting hearing aids, it took on average 87 days for KDOC to evaluate/meet those needs.  (This statistic is 11 days longer than I reported in my prior report, because it now includes all but one of the 11 cases that were ongoing as of May 2020, whose processing times were substantially longer than typical.) Table 3 shows the year-by-year trend (omitting four cases for which I do not have the start and/or the end dates):

**Table 4: Processing Times for Inmates Who Received Hearing Aids**

| When prison alerted to hearing issue | N | Avg. days to resolution | Still ongoing |
|---|---|---|---|
| 2016 (includes 11 from 2015) | 89 | 198 | 0 |
| 2017 | 205 | 149 | 0 |
| 2018 | 321 | 138 | 1 |
| 2019 | 477 | 87 | 1 |
| 2020 (through December 1) | 315 | 54 | 7 |
| **All, 2015 to present** | **1407** | 107 | 9 |

Moreover, so far, 2020 is looking notably better than 2019—the average of 54 days is both substantially shorter than the prior year's average, and it is distorted only by 9 ongoing cases, so is likely to be at least close to the final average, once those last handful of cases are resolved. (See below.) That said, 54 days is an average; resolution times were occasionally far longer.  See Table 5:

**Table 5: 2020, distribution of processing time
for inmates who received hearing aids.**

| Resolved in: | % | Cumulative % |
|---|---|---|
| <= 30 days | 19% | 19% |
| 30-60 days | 52% | 71% |
| 60-90 days | 20% | 91% |
| 90-120 days | 5% | 96% |
| 120-180 days | 3% | 99% |
| > 180 days | 1% | 100% |

As Table 5 shows, about 30% of cases in 2020 have taken over 2 months—one third of those (9%) have taken over 3 months.  Moreover, both Table 4 and Table 5 slightly overstate the speed of resolution. As of December 1, there were 9 inmates whose audiology evaluation were still in process; the eight for whom I have data are tallied in Table 6. The COVID-19 pandemic is the reported cause for several of the delays.

**Table 6: Ongoing Audiology Needs, as of December 1, 2020**

| Date KDOC alerted | Progress/Cause for delay | Prison | Days in process (as of 12/1/2020) |
|---|---|---|---|
| 9/15/2018?? | No notes | NTC | 808 |
| 4/10/2019 | Being followed by outside ENT. | GRCC | 601 |
| 3/3/2020 | New cochlear implant ordered; waiting for offsite ENT to call when it's ready.  COVID delay. | LLCC | 273 |
| 3/16/2020 | No notes | WKCC | 260 |
| 4/27/2020 | Outside ENT appointment scheduled for January 2021. | LSCC | 218 |
| 5/23/2020 | Awaiting offsite appointment to receive special hearing aid. | KSP | 192 |
| 9/18/2020 | Inconclusive hearing test performed September 2020; (delayed) chart review in November ordered a second test, but COVID lockdown has further delayed test. | LSCC | 74 |
| 9/19/2020 | Inconclusive hearing test performed September 2020; chart review 10 days later ordered a second test, but COVID diagnosis/lockdown has delayed that. | LSCC | 73 |

As of December 1, 2020, the ongoing cases were an average of 312 days old. Obviously by the time they are resolved, the average resolution time will be higher. But unlike in prior reports, there are only a few. And the pandemic obviously poses really significant challenges not previously present—this is particularly the case at LSCC.

These summary statistics mask considerable variation among facilities.  Table 7 examines the issue facility by facility (omitting the cases for which dates are unavailable.).  It shows days to resolution by prison, setting out both the average and various percentiles (10%ile, 25%ile, 50%ile, 75%ile, and 90%ile). Figures over the 60 day recommendation are highlighted in yellow;

outliers are highlighted in red.

**Table 7: Days to Resolution by Institution (Cases begun 2020, Hearing Aid Received)**

|        | N   | Avg. | 10%ile | 25%ile | 50%ile | 75%ile | 90%ile |
|--------|-----|------|--------|--------|--------|--------|--------|
| BCC    | 4   | 57.8 | 44     | 49.5   | 58     | 66     | 71     |
| BCFC   | 1   | 23.0 | 23     | 23     | 23     | 23     | 23     |
| EKCC   | 14  | 45.1 | 27     | 35     | 48     | 55     | 58     |
| GRCC   | 11  | 87.8 | 25     | 29     | 43     | 165    | 219    |
| KCIW   | 22  | 35.2 | 22     | 23     | 32     | 39     | 61     |
| KSP    | 19  | 45.8 | 22     | 29     | 40     | 63     | 83     |
| KSR    | 50  | 61.0 | 30.5   | 44     | 58.5   | 73     | 86     |
| LAC    | 6   | 46.5 | 35     | 42     | 44.5   | 52     | 61     |
| LLCC   | 27  | 52.7 | 26     | 31     | 36     | 59     | 113    |
| LSCC   | 24  | 52.8 | 27     | 36     | 50     | 65     | 94     |
| NTC    | 37  | 57.1 | 27     | 33     | 41     | 85     | 111    |
| RCC    | 77  | 52.7 | 28     | 33     | 41     | 64     | 78     |
| Ross   | 4   | 55.5 | 21     | 38.5   | 63.5   | 72.5   | 74     |
| WKCC   | 19  | 49.2 | 21     | 31     | 39     | 57     | 75     |
| **Total** | **315** | **53.5** | **26** | **33** | **44** | **65** | **86** |

The total picture on audiology processing demonstrates that the institution-wide focus on process efficiencies, tracking, and followup is paying off.

## V. OTHER ISSUES

A few other issues emerged from reporting:

- GRCC, LLCC, and RCC reported that even inmates who sign to communicate are transported with full hand-restraints. This renders such inmates unable to communicate. *Other institutions have implemented special restraints to be used during transport of inmates who sign; those that have not should consult with them and adjust accordingly.* See Settlement Agreement XI.A.2 ("The two-point system would allow a Deaf Inmate to use his or her hands for communicating via sign language to some degree. KDOC training will include both the two-point system as well as the agreement that hand restraints will be removed from a Deaf Inmate when the Deaf Inmate is in a secure environment, when security is no longer a threat, **or** there are other security devices in place to allow the Deaf Inmate to Effectively Communicate.").

- RCC reported that only a minority of HOH inmates know who the ADA Coordinator is; this suggests that in-person auxiliary aid assessments may not have been done, and that the ADA handout should include the information on how to reach the ADA Coordinator, for inmates' future reference.

- Several facilities reported that there is no method for an inmate to request a hearing-related accommodation during a disciplinary investigation and/or proceeding, using the KOMS form. This is a state-wide issue; *the KOMS entry screen relating to discipline should be adjusted to allow accommodation/interpretation requests.*

**VI. CONCLUSION**

The new recommendations in this report are:

1. *I recommend completion of the planned KOMS improvements.  In addition, once the ADA flag is triggered by a medical diagnosis, I recommend that medical staff review the appropriate information for each one and place their diagnoses into KOMS.*

2. *Now that ADA identification issues are sorted out, I recommend that KDOC and Wellpath conduct records both retrospective and prospective review to ensure correct documentation and diagnosis flags.*

3. *I recommend that KDOC make periodic efforts to remind medical providers that while binaural amplification is not to be provided routinely, it is appropriate where there is a safety or vocational need for it. In addition, it would be a good practice for medical grievances raising binaural amplification to be evaluated by a different physician, to bring a fresh perspective to the request.*

4. *I recommend that Wellpath's specialty clinic coordinator conduct spot checking to ensure that her tracking list includes all inmates who are undergoing audiology workup, including prediagnosis, and solve any problems that emerge.*

5. *I recommend that, going forward, KDOC headquarters closely monitor videophone outage periods and other technical difficulties and consider alternative vendors or other solutions.*

6. *The ADA Coordinators should periodically remind staff that access to the videophone, TTY, and captioned telephones should be afforded inmates during the same periods for which hearing inmates can access regular telephones.*

7. *Hard-of-hearing inmates should be informed that the phone amplifiers exist, and the process for using them should be made easy.*

8. *It would be appropriate to add additional volume-control phones wherever practicable.*

9. *I strongly recommend that headquarters test both the TTYs and captioned telephones at least twice each year, to ensure that they all stay operational.*

10. *Captioned telephones have amplification features, so ADA Coordinators should inform hard-of-hearing inmates that these are available to them.*

11. *I recommend that headquarters staff obtain access to an online TTY (via http://www.nextalk.com/) and then conduct at least twice yearly TTY-to-TTY and TTY-to-voice testing of each institution's TTY.*

12. *I recommend that the ADA Coordinators for the institutions where the transmitter devices are being used successfully in classes and the like share with their colleagues that practices that are producing those successes.*

13. *The proposed standards language relating to parole and deaf/HOH inmates should be adopted.*

14. *I continue to recommend that at every prison, (1) flashing lights be used for routine alerts where practicable, (2) Deaf/HOH (not just Deaf) inmates be provided a method by which they can obtain non-auditory alarm watches or clocks, and (3) in-person notifications be provided where needed for personal alerts, whether by staff or other inmates. This issue will require additional fine-tuning, training, and monitoring.*

15. *ADA Coordinators should continue to communicate to inmates that they have access to non-auditory alarms that can help alert them to various scheduled events in the prison.*

16. *I continue to recommend that non-routine announcements be communicated in some non-auditory fashion; if bulletin boards are not a workable solution, some other solution is needed, in each housing unit.*

17. *Auxiliary aid meetings should be held, in person, with each inmate and for non-medical staff to affirmatively inform inmates of the available devices and services.*

18. *Clear masks and masks that attach behind the wearer's head, rather than behind the ears, are essential. Both are reportedly available at all KDOC institutions, but at some institutions seem to be in use only rarely. Inmates who are Deaf/HOH should be affirmatively asked if their comprehension would be assisted by clear masks for staff in their housing units, work-places, programs, etc., and if they answer yes, those masks should be issued/used accordingly. In addition, staff who will deal with Dear/HOH inmates more generally—the ADA Coordinator, Unit Administrators, etc., should be issued clear masks for use when appropriate. All inmates who wear hearing aids should be offered behind-head masks.*

19. *ADA Coordinators should review phone issues, and ensure that (a) there are enough volume-adjustable and HOH phones for usage patterns, (b) phones are in a space quiet enough to allow HOH individuals to use them, (c) any voice-recognition issues are solved.*

20. *Complaints about accommodations suggest a need to conduct auxiliary aid meetings not just once on an inmate's arrival to a prison, but every year or two.*

21. *The loss of hearing aids on transfer within and between prisons is a longstanding and demonstrated problem. The solution is additional staff training/alertness, and property checklists that include hearing-related equiptment. The battery issue has become more prevalent during the pandemic; I recommend that Wellpath review battery availability, prison by prison, and ensure a sufficient stock to avoid shortages. In addition, KDOC/Wellpath should ensure that inmates receive hearing aids medically suited to their situation.*

22. *Staff responsible for disciplinary adjudication should be trained that it is inappropriate to penalize someone for their disability (e.g., for failing to obey an order they did not hear), and that they should ask appropriate questions and document their thought processes with respect to this issue in relevant disciplinary cases. Each ADA Coordinator should conduct such training immediately for appropriate staff, and then repeat it as necessary when new employees assume the disciplinary adjudication role.*

23. *Institutions that have not implemented special transport restraints for inmates who sign to communicate should consult with those who have implemented such restraints and adjust accordingly.*

24. *The KOMS entry screen relating to discipline should be adjusted to allow accommodation/interpretation requests.*

As has been true throughout the Settlement Agreement period, KDOC staff have been professional in their efforts to implement the agreement, and helpful to me as I ask them monitoring questions. In fact, 2020 saw a significant increase in efforts to improve compliance, led by KDOC headquarters; the resulting compliance improvements are apparent in this report.

As usual, there have been both successes and challenges to report—but the balance shifted in this report towards successes. At this point, I believe that KDOC has in place a system already compliant in large part with the ADA and the settlement agreement—and capable of maintaining its successes and improving going forward, if the Department continues to appoint, train, and support the ADA Coordinators and their efforts.

It has been a privilege to assist the parties and the Court in this lawsuit.


Respectfully submitted,


Margo Schlanger

Margo Schlanger
Settlement Monitor
625 So. State Street
Ann Arbor, MI 48109
adams.settlement.monitor@gmail.com


December 16, 2020